[Civ. No. 15575. First Dist., Div. Two. Oct. 24, 1952.]

ANN ARAPAJOLU et al., Petitioners, v. EMMET G. McMENAMIN, as County Clerk, etc., et al., Respondents.

Farr & Millard for Petitioners.

Burr Scott, District Attorney (Monterey), and Joseph A. Stave, Deputy District Attorney, for Respondents.

DOOLING, J.—The petitioners, 15 in number, seek by writ of mandate to compel respondents, county clerk of Monterey County and his deputy in charge of the registration of voters, to qualify them as registered voters of said county.

All of the petitioners reside on military reservations situated within the exterior boundaries of Monterey County, some at Fort Ord, some at the Presidio of Monterey, and the others at Hunter Liggett Military Reservation. Some of the petitioners are civilian employees of the United States Government, some are in the armed forces of the United States, some are spouses of persons in these two classes and one is a civilian with her own mercantile business who is also postmistress of Jolon within the confines of Hunter Liggett Reservation. All of the petitioners have the necessary length of residence to qualify them as voters in Monterey County if residence on a military reservation of the United States within the exterior boundaries of Monterey County is residence within the State of California and the county within the meaning of section 1, article II of the Constitution of California which gives the right to vote to every citizen of the United States over 21 years of age 90 days prior to any election ''who shall have been a resident of the State one year next preceding the day of the election, and of the county . . . 90 days, and in the election precinct 54 days.'' The ground upon which respondents have cancelled the registration of some of petitioners and refused to accept the registration of the others is the claim that the military reservations on which they respectively reside are subject to the exclusive jurisdiction of the United States and hence are not legally a part of the territory of the State of California.

The question arises under clause 17, section 8, article I of the United States Constitution which gives Congress the power ''To exercise exclusive legislation in all cases whatsoever, over such district . . . as may, by cession of particular States, and the acceptance of Congress, become the seat of government of the United States, and *to exercise like authority over all places purchased by the consent of the Legislature of the State in which the same shall be, for the erection of forts,*

*magazines, arsenals, dockyards, and other needful buildings."* (Emphasis ours.)

It has been consistently held whenever the question has arisen that property acquired by the United States under this provision of the Constitution of the United States, with the consent of the Legislature of any state which confers the exclusive power of legislation on Congress, ceases in legal contemplation to be a part of the territory of the state and hence residence thereon is not residence within the state which will qualify the resident to be a voter therein. (*Opinion of Justices,* 1 Metc. (42 Mass.) 580; *Sinks* v. *Reese,* 19 Ohio St. 306 [2 Am.Rep. 397]; *In re Town of Highlands,* 22 N.Y.S. 137; *McMahon* v. *Polk,* 10 S.D. 296 [73 N.W. 77]; *State* v. *Willett,* 117 Tenn. 334 [97 S.W. 299]; *Herken* v. *Glynn,* 151 Kan. 855 [101 P.2d 946]; *Arledge* v. *Mabry,* 52 N.M. 303 [197 P.2d 884].)

The rationale of these decisions is clearly stated in *Sinks* v. *Reese, supra,* 19 Ohio St. at page 316:

"By becoming a resident inmate of the asylum, a person though up to that time he may have been a citizen and resident of Ohio, ceases to be such; he is relieved from any obligation to contribute to her revenues, and is subject to none of the burdens which she imposes on her citizens. He becomes subject to the exclusive jurisdiction of another power, as foreign to Ohio as is the State of Indiana or Kentucky, or the District of Columbia."

It may be conceded that where the Congress exercises the power of exclusive legislation over territory acquired by the United States with the consent of a state Legislature the state thereby loses all jurisdiction over such territory and such territory is no longer in legal contemplation a part of the state, but such concession is not conclusive of the question presented to us under the conditions presently existing.

It was long doubted whether a state could constitutionally reserve any jurisdiction over land acquired by the United States with the consent of the state Legislature under clause 17, section 8, article I of the United States Constitution. Thus Justice Field speaking for the Supreme Court of the United States said in *Fort Leavenworth R. Co.* v. *Lowe,* 114 U.S. 525, 532-533 [5 S.Ct. 995, 29 L.Ed. 264]:

"When the title is acquired by purchase by consent of the Legislatures of the States, the federal jurisdiction is exclusive of all State authority. This follows from the declaration of the Constitution that Congress shall have 'like authority'

over such places as it has over the district which is the seat of government; that is, the power of 'exclusive legislation in all cases whatsoever'. Broader or clearer language could not be used to exclude all other authority than that of Congress; and that no other authority can be exercised over them has been the uniform opinion of Federal and State tribunals, and of the Attorneys General.''

The only reservation then recognized was that civil and criminal process of the state courts might be served therein and this was treated as an act of comity and not as a reservation of any jurisdiction in the state. In the same case, referring to this right to serve state process within such federal enclaves Justice Field quoted from the opinion of Justice Story in *United States* v. *Cornell*, 2 Mason 60 (*Fort Leavenworth. R. Co.* v. *Lowe, supra,* 114 U.S. p. 534):

''Now, there is nothing incompatible with the exclusive sovereignty or jurisdiction of one State that it should permit another State in such cases to execute its process within its limits. And a cession of exclusive jurisdiction may well be made with a reservation of a right of this nature, which then operates only as a condition annexed to the cession, and as an agreement of the new sovereign to permit its free exercise as *quoad hoc* his own process.''

In the later case of *Surplus Trading Co.* v. *Cook*, 281 U.S. 647 [50 S.Ct. 455, 74 L.Ed. 1091], this doctrine was reaffirmed in a case holding that a state could not tax private personal property located on a military reservation acquired by the United States with the consent of the state Legislature under clause 17, section 8, article I of the United States Constitution. The court said at page 652:

''The question is not an open one. It long has been settled that where lands for such a purpose are purchased by the United States with the consent of the state legislature the jurisdiction theretofore residing in the State passes, in virtue of the constitutional provision, to the United States, thereby making the jurisdiction of the latter the sole jurisdiction.''

This question, however, was later reexamined by the Supreme Court of the United States in *James* v. *Dravo Contracting Co.,* 302 U.S. 134 [58 S.Ct. 208, 82 L.Ed. 155, 114 A.L.R. 318]. In that case after holding that the lands acquired by the United States (for a dam site) with the consent of the state Legislature fell within the provisions of clause 17, section 8, article I of the United States Constitution (302 U.S. p. 143) the court upheld as constitutional a

reservation of concurrent jurisdiction in the state insofar as its exercise would not be inconsistent with the governmental uses. The court said at pages 148-149:

"Clause 17 contains no express stipulation that the consent of the State must be without reservations. We think that such a stipulation should not be implied. We are unable to reconcile such an implication with the freedom of the State and its admitted authority to refuse or qualify cessions of jurisdiction when purchases have been made without consent or property has been acquired by condemnation. In the present case the reservation by West Virginia of concurrent jurisdiction did not operate to deprive the United States of the enjoyment of the property for the purposes for which it was acquired, and we are of the opinion that the reservation was applicable and effective."

The court further commented at page 148:

"The possible importance of reserving to the State jurisdiction for local purposes which involve no interference with the performance of governmental functions is becoming more and more clear as the activities of the Government expand and large areas within the States are acquired. There appears to be no reason why the United States should be compelled to accept exclusive jurisdiction or the State be compelled to grant it in giving its consent to purchases."

■ Since the decision of the United States Supreme Court in the Dravo case it has become established law that not only can the state Legislatures reserve to their states a portion of their preexisting jurisdiction in the cases where land is acquired within their borders by the United States pursuant to clause 17, section 8, article I of the United States Constitution, so long as such reserved jurisdiction is not inconsistent with the governmental use for which the property is acquired, but also that the Congress may recede or return to the states any jurisdiction over such properties which is not inconsistent with such governmental use.

Thus, although workmen's compensation laws cannot extend over federal lands within the state while the United States has exclusive jurisdiction (*Allen* v. *Industrial Acc. Com.,* 3 Cal.2d 214 [43 P.2d 787]; *cf. Atkinson* v. *State Tax Com.,* 303 U.S. 20, 25 [58 S.Ct. 419, 82 L.Ed. 621]), by an Act of Congress now codified in 40 U.S.C.A. section 290 the operation of such laws has been extended to "all lands and premises owned or held by the United States of America . . . which is within the exterior boundaries of any State, in the

same way and to the same extent as if said premises were under the exclusive jurisdiction of the State . . ."

In *Capetola* v. *Barclay White Co.*, 139 F.2d 556, cert. den. 321 U.S. 799 [64 S.Ct. 939, 88 L.Ed. 1087], the Circuit Court of Appeals, 3d Cir., said of this act at page 559:

"It is, of course, patent from a reading of the Act of 1936 that Congress did not thereby adopt State Compensation Acts as federal law applicable to federal territories within the exterior boundaries of the states. But it is our opinion that the purpose and effect of the congressional Act was to free State workmen's compensation laws from the restraint upon their enforcement theretofore existing by reason of the exclusive federal jurisdiction of lands within the States and that, forthwith upon the federal enactment, Pennsylvania's Workmen's Compensation Act became operable as to injuries received by employees of private employers on federal property within the State's exterior boundaries. The situation created by the Act of 1936 was no different, so far as the operation of Pennsylvania's compensation law is concerned, than it would have been had Pennsylvania never ceded jurisdiction of the Navy Yard site to the federal government."

In like fashion the Congress has receded and returned to the states jurisdiction over federal lands within their borders to enforce state unemployment insurance acts therein (26 U.S.C.A. § 1606(d)); to tax motor fuels sold therein (4 U.S. C.A: § 104); to levy and collect sales and use taxes therein (4 U.S.C.A. § 105); and to levy and collect state income taxes therein (4 U.S.C.A. § 106). The power to collect all such taxes depends upon the existence of state jurisdiction over such federal lands and therefore may not be exercised in territory over which the United States has exclusive jurisdiction. (*Standard Oil Co.* v. *California*, 291 U.S. 242 [54 S.Ct. 381, 78 L.Ed. 775].) In recognition of this fact the Congress has made these recessions to the states in terms of jurisdiction, e.g. 4 U.S.C.A. §§ 105 and 106: "and such State or taxing authority shall have full jurisdiction and power to levy and collect any such tax in any Federal area within such state . . ."; 26 U.S.C.A. § 1606(d): "and any State shall have full jurisdiction and power to enforce the provisions of such law . . . as though such place were not owned, held, or possessed by the United States."

Of the recession by the Congress to the states of the jurisdiction over federal lands to levy and collect income taxes

on incomes earned therein or by residents thereof the Supreme Court of Pennsylvania said in *Kiker* v. *City of Philadelphia,* [346 Pa. 624] 31 A.2d 289, cert. den. 320 U.S. 741, at page 295 [64 S.Ct. 41, 88 L.Ed. 439] :

"The reservation is immediately adjacent to Philadelphia; is geographically within its limits; and since December 31, 1940, because of the provisions of Public Act No. 819, *is actually part of that City* for the purposes of imposing the tax here under consideration." (Emphasis ours.)

So in speaking of the recession of jurisdiction to collect taxes on motor fuel used or sold on federal lands the Oklahoma Supreme Court in *Sanders* v. *Oklahoma Tax Com.,* 197 Okla. 285 [169 P.2d 748], cert. den. 329 U.S. 780 [67 S.Ct. 202, 91 L.Ed. 670], used the following language found on page 751:

"It follows that plaintiff, having used the gasoline in an area which in legal contemplation *was no different from any other part of the state,* became liable for the tax upon its use and the trial court correctly so held." (Emphasis ours.)

There seems no necessity to multiply citations. It is clear that the Congress has receded to the states jurisdiction in substantial particulars over federal lands over which the United States previously had exclusive jurisdiction. It may no longer be said of those lands that they are, as said by the Ohio court in *Sinks* v. *Reese, supra,* "as foreign to Ohio (California) as is the State of Indiana or Kentucky, or the District of Columbia."

It is settled for California by the case of *Johnson* v. *Morrill,* 20 Cal.2d 446 [126 P.2d 873] that where the United States does not accept exclusive jurisdiction over lands held by it residence therein is residence within the State of California for voting purposes.

The right to vote is granted by the Constitution of the state and the conditions set forth in section 1, article II thereof are self-executing and cannot be abridged by the Legislature. (*Spier* v. *Baker,* 120 Cal. 370 [52 P. 659, 41 L.R.A. 196] ; *Communist Party* v. *Peek,* 20 Cal.2d 536 [127 P.2d 889] ; *McMillan* v. *Siemon,* 36 Cal.App.2d 721 [98 P.2d 790].) The right to vote has been described "as one of the highest privileges of the citizen" (*Spier* v. *Baker, supra,* 120 Cal. 375) and as "one of the most important functions of good citizenship" (*McMillan* v. *Siemon, supra,* 36 Cal.App. 2d 726). No citizen should be disfranchised lightly or on ultratechnical grounds. All of the election cases cited above,

except *Arledge* v. *Mabry, supra,* 52 N.M. 303 [197 P.2d 884], in which residents on federal lands were held not to be residents of the state so as to qualify them to vote were decided at a time when the United States did have and exercise exclusive jurisdiction over those lands, and while *Arledge* v. *Mabry* was decided after the recessions of jurisdiction above set out the court in that case did not consider their effect but assumed that the United States still had and exercised exclusive jurisdiction. See 197 P.2d 890 where the court says:

"In a variety of situations, other than that involving the right of residents of ceded land to exercise the elective franchise, both state and federal courts have held the jurisdiction of the United States to be full and complete, or as the selected word 'exclusive' implies."

The jurisdiction over these lands is no longer full or complete or exclusive. A substantial portion of such jurisdiction now resides in the states and such territory can no longer be said with any support in logic to be foreign to California or outside of California or without the jurisdiction of California or within the exclusive jurisdiction of the United States. It is our conclusion that since the State of California now has jurisdiction over the areas in question in the substantial particulars above noted residence in such areas is residence within the State of California entitling such residents to the right to vote given by section 1, article II of our Constitution.

This conclusion accords with an excellent opinion of the attorney general of the state given to the district attorneys of several counties on September 6, 1952 (Opinion No. 52-183) 20 Opinions of the Attorney General of California 127.

Respondents argue in their brief: "The states could have reserved the right to vote at the time of original cession where such right did not conflict with federal use of the property . . . but did not do so." We cannot follow the force of this argument. The State of California did not relinquish to the United States the right of citizens resident on federal lands to vote nor did the United States acquire those rights. The right to vote is personal to the citizen and depends on whether he has met the qualifications of section 1, article II of our Constitution. If the state retains jurisdiction over a federal area sufficient to justify a holding that it remains a part of the State of California a resident therein is a resident of the state and entitled to vote by virtue of

the constitutionally granted right. No express reservation of such rights is necessary, nor could any attempted express cession of such rights to the United States be effective.

 As to those petitioners who are members of the armed services respondents make the additional argument that they cannot legally acquire residence in the areas in which they are stationed, because they do not "voluntarily" reside there. Cases from other jurisdictions are cited to this effect. It is sufficient to point out that this has never been the rule in California. Our cases hold that members of such services can acquire residence where they are stationed. (*People* v. *Holden,* 28 Cal. 123 (a voting case); *Stewart* v. *Kyser,* 105 Cal. 459 [39 P. 19] (a voting case); *Percy* v. *Percy,* 188 Cal. 765 [207 P. 369]; *Berger* v. *Superior Court,* 79 Cal.App.2d 425 [179 P.2d 600].) The rule is simply stated in *Percy* v. *Percy, supra,* at page 768:

"The fact that at the time in question he was on military duty in an army camp did not preclude him from establishing his residence there if he so desired."

It is ordered that a peremptory writ of mandate issue as prayed.

Goodell, Acting P. J., and Jones, J. pro tem., concurred.

Respondents' petition for a hearing by the Supreme Court was denied December 22, 1952. Shenk, J., Edmonds, J., and Carter, J., were of the opinion that the petition should be granted.