## ROYER ET AL. *v.* BOARD OF ELECTION SUPERVISORS FOR CECIL COUNTY, MARYLAND

[No. 327, September Term, 1962.]

*Decided June 7, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, MARBURY and SYBERT, JJ.

*Fred E. Weisgal* and *Bernard G. Link,* for appellants.

*Frank C. Sherrard,* for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from an order dismissing a petition for appeal under Code (1957), Art. 33, sec. 46, cf. Code (1962 Supp.), Art. 33, sec. 46 (e), praying an order requiring the Board of Election Supervisors of Cecil County to register the petitioners as qualified voters in Cecil County. The salient facts are stipulated. The petitioners are civilian employees of the United States Government at the Perry Point Veterans' Hospital, located within the geographical limits of Cecil County, and reside and work there, having no other residence in the County. Dr. Royer has two children attending the public schools in Cecil County and he has resided at Perry Point for the past five years. Dr. Williams has two children attending the public schools of Cecil County, and she has resided at Perry Point for eleven years.

The tract known as Perry Point, consisting of about five hundred acres of land, was purchased by the United States Government in 1918 and used to manufacture chemicals for war purposes. A manufacturing plant was erected thereon and a number of workers' houses and facilities. It now contains, in addition, hospitals for the care and treatment of disabled veterans, operated by the Veterans' Administration. The tract was purchased in strict accordance with the provisions of the Federal Constitution, for the purposes mentioned in Article I, sec. 8, clause 17, and with the consent of the State of Maryland. Exclusive jurisdiction was ceded by the State, in accordance with the provisions of Chapter 743 of the Acts of 1906, now codified as Code (1957), Art. 96, secs. 31, 36 and 37. The only reservation by the State was the right to serve civil and criminal process upon persons found there. The State expressly agreed that the land ceded should be exempt "from all State, county and municipal taxation, assessment, or other charges which may be levied or imposed under the authority of this State."

The Congress of the United States has since enacted various statutes waiving or receding to the States jurisdiction in certain particulars. The "Buck Act," in 1947, now codified as 4 U.S.C.A., secs. 104-106, provides in substance that the States may collect from persons residing on Federal reservations (a) income taxes, (b) sales and use taxes, (c) motor vehicle and heating fuel taxes. By 40 U.S.C.A., sec. 290, civilian residents on Federal reservations are made subject to state Workmen's Compensation Laws, and by 26 U.S.C.A., 3305, to Unemployment Compensation Laws of the States. The petitioners pay State income, sales and use taxes, the fuel tax, and motor vehicle registration and operator's license fees.

The appellants contend, (1) that they are residents of this State within the meaning of Article I, sec. 1, of the Maryland Constitution, and (2) that the refusal of the Board to register them as voters deprives them of rights guaranteed by the Fourteenth Amendment to the Federal Constitution, and particularly the equal protection clause.

The provision of the Maryland Constitution, cited above, confers the right to vote upon every citizen of the United States, of the age of 21 years or upwards, "who has been a resident of the State for one year, and of the Legislative District of Baltimore city, or of the county, in which he may offer to vote, for six months next preceding the election * * * in the ward or election district, in which he resides * * *." The appellants concede that until a few years ago courts throughout the nation have generally held that where the United States Government has obtained title to, and exclusive jurisdiction over, land within the territorial boundaries of a state, the residents of the ceded area were no longer residents of the state. This Court has ruled upon precisely this point in *Lowe v. Lowe,* 150 Md. 592 (1926), where the territory involved was the same as in the instant case. The holding was that a resident of Perry Point had not acquired a residence for the purpose of filing suit for divorce. Chief Judge Bond, joined by Judge Urner, dissented on the ground of necessity and because he thought it unlikely that the Found-

ing Fathers should have contemplated the creation of a legal no-man's-land where residents of Federal enclaves would have no court to adjudicate questions of domestic relations. The Maryland Legislature promptly afforded relief in this field to persons residing on Federal reservations. See Code (1957), Art. 16, sec. 23. (Ch. 225, Acts of 1927). It subsequently opened the State courts to such residents in adoption proceedings. See Code (1957), Art. 16, sec. 69. It also opened its schools to children residing on Federal reservations, presumably receiving negotiated payments therefor under 20 U.S.C.A., sec. 236, *et seq.*

However, the Maryland Legislature took no such action in regard to voting rights. In fact, we are informed by the appellees that a bill to confer such rights upon all residents of Federal reservations in Maryland was introduced in the 1962 session but failed of passage. In the *Lowe* case this Court specifically stated (p. 600) : "It is therefore clear that persons residing upon the government reservation at Perry Point are not residents of the State of Maryland for the purpose of exercising the right of franchise * * *, for the reason that they reside upon territory belonging to the United States and not the State of Maryland". The Attorney General has also ruled specifically that residents of Perry Point are not entitled to registration in Cecil County. See 17 Opinions of the Attorney General 139 and 36 Opinions of the Attorney General 129. In the opinion last cited Attorney General Hammond ruled that a bill seeking to confer the right to vote on residents of Perry Point was discriminatory and hence unconstitutional because it was limited to residents of that area, and because it would require a constitutional amendment to alter the meaning of the term resident in Article I, section 1 of the Maryland Constitution. We express no opinion on the point, which is not now before us.

The appellants' chief reliance is upon an argument that the "Buck Act" has conferred benefits upon the States, and that the States should reciprocate. It may be noted that the appellants do not pay any property taxes, and hence do not contribute as much as local residents to the cost of local govern-

ment. As the appellees point out, the fact that the Congress has permitted State workmen's compensation and unemployment acts to apply, and that the State has opened its courts and schools, to residents of the Federal enclave, are beneficial to those residents. The fact that they pay automobile fees and sales taxes is for the privilege of driving, or buying, in Maryland. Maryland collects no taxes upon activities confined to the reservation.

But in any event, the mere fact that the United States Government has seen fit to yield, for the time being and for reasons of policy, some of its exclusive rights to the States, does not, we think, amount to a general grant of concurrent jurisdiction. Nor does it compel the States to afford voting privileges. We find nothing to the contrary in *James v. Dravo Contracting Co.,* 302 U. S. 134, 148, relied on by the appellants. Nor do we find in the latest case on the subject, *Paul v. United States,* 371 U. S. 245, any intimation that the Fourteenth Amendment will be extended to cover residents of Federal enclaves, where the matter has traditionally been left to adjustment between the Federal and State legislative bodies.

Certain commentators have pointed out the difficulties and hardships inherent in the situation, but they do not suggest that the law is not well settled. See 58 Yale L. Rev. 1402 and 101 U. of Penn. L. Rev. 124. It would appear that the weight of authority, and virtually all the earlier cases, support the proposition that residents of Federal enclaves, where the Federal government has exclusive jurisdiction, are not state residents for voting purposes. See *Sinks v. Reese,* 19 Ohio State 306, 310, cited in the *Lowe* case, and followed in *State, ex rel. Wendt et al v. Smith et al,* 103 N. E. 2d 822 (Ohio); *Arledge v. Mabry,* 197 P. 2d 884 (N. M.), cf. *Montoya v. Bolack,* 372 P. 2d 387 (N. M.); *Herken v. Glynn,* 101 P. 2d 946 (Kan.); *McMahon v. Polk,* 73 N. W. 77 (S.D.); *In re Town of Highlands,* 22 N. Y. S. 137. Many cases in accord are cited in a note 34 A.L.R. 2d 1193.

The appellants rely upon three recent cases, *Arapajolu v. McMenamin,* 249 P. 2d 318 (Cal. App.), *Rothfels v. Southworth,* 356 P. 2d 612 (Utah), and *Adams v. Londeree,* 83

S. E. 2d 127 (W. Va.). The *Arapajolu* case was decided by an intermediate court, and the case was denied review by the Supreme Court of California, three judges dissenting. The decision turned on the court's construction of the local statute. See also the comment on the case in *Schwartz v. O'Hara TP. School Dist.*, 100 A. 2d 621 (Pa.). In both the *Rothfels* and *Adams* cases there were powerful dissents, and the decisions were rested on the local statutes and the fact that the state had reserved concurrent jurisdiction. We think these cases are readily distinguishable and not persuasive.

The appellants' constitutional argument seems to be based, not upon a claim of equal protection but on a claim of "taxation without representation." This colonial slogan is not found in our State Constitution, or in the Federal Constitution, and the principle is not without exception. See *Thomas v. Gay*, 169 U. S. 264, 276. Moreover, we need only look to the District of Columbia, once a part of Maryland before exclusive jurisdiction was ceded to the Federal Government, to see that the right to tax is not inseparable from the right to vote, for the residents of that area are taxed although they have no right to vote for the persons who impose the taxes in that taxing area.

For all of the foregoing reasons we hold that the *Lowe* case is controlling. If a change is desirable, on which we express no opinion, we think it should be through adjustment by the sovereign legislative bodies and not imposed by the courts.

*Order affirmed, with costs.*