Tillye CORNMAN; Herbert Tabor; Celia White Tabor; Edward Tabor; Mary D. Pratt; Elliott Vessell; Reynold R. Holliday; Elizabeth J. Holliday; Chris A. Hansen; Mary E. Hansen; Carlos Shultz; and Frances Legallais, Plaintiffs,

v.

Rose K. DAWSON and Marie M. Garber, as Members of the Permanent Board of Registry for Montgomery County, Maryland, Defendants.

Civ. No. 20028.

United States District Court
D. Maryland.

Jan. 29, 1969.

Richard Schifter and Strasser, Spiegelberg, Fried, Frank & Kampelman, Washington, D. C., and Howard J. Thomas, Silver Spring, Md., for plaintiffs.

George W. Liebmann, Asst. Atty. Gen., and Robert F. Sweeney, Deputy Atty. Gen., Baltimore, Md., and Carl Lee Frederick, Jr., Wheaton, Md., for defendants.

Before WINTER, Circuit Judge, THOMSEN, Chief Judge, and HARVEY, District Judge.

HARVEY, District Judge:

In this action brought under the Civil Rights Act,[1] plaintiffs challenge a provision of the Maryland Constitution which they claim has denied them the right to vote. Pursuant to 28 U.S.C.

1. 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

§ 2281, a three-judge court has properly been convened, and the case has been heard on the pleadings and stipulations of the parties.

All twelve plaintiffs reside on the grounds of the National Institute of Health, a federal reservation located within the geographical boundaries of Montgomery County, Maryland. Ten of the twelve had been registered voters within the State of Maryland for many years until October 19, 1968 when they were advised by the defendants, who are members of the Permanent Board of Registry of Montgomery County, that their names would be removed from the County voters' registry because as residents of federal property they did not qualify for voting in Maryland under the State Constitution. Two of the plaintiffs attempted to register to vote in the general election to be held on November 5, 1968 but were not permitted to do so for the same reasons.

Plaintiffs thereupon filed this action seeking a declaratory judgment and injunctive relief which would prevent the removal from the voters' registry of the names of ten of the plaintiffs and which would require the registration of the other two plaintiffs. Plaintiffs also filed a motion together with affidavits seeking a temporary restraining order and a preliminary injunction. On October 25, 1968, which was one day after the complaint and motion were filed, a hearing was held before this Court. In view of the very short time for preparation on both sides, the Court did not attempt to render a decision on the merits of the case following that hearing. However, pursuant to 28 U.S.C. § 2284(3), Chief Judge Thomsen entered an order on Oc-tober 28, 1968 enjoining the defendants until further order of this Court from removing the names from the voters' registry of the ten plaintiffs who had previously been registered.[2] Such order did not require the defendants to register the other two plaintiffs. Following the submission of briefs, another hearing before the Court was held on January 2, 1969 at which time the case was fully argued on the merits. Additional stipulations have likewise been filed.

The provision of the Maryland Constitution under attack is Article I, § 1, which gives the right to vote to every citizen of the United States of the age of 21 years or more "who has been a resident of the State for one year, and of * * * the county, in which he may offer to vote, for six months next preceding the election, * * *". In Royer v. Board of Election Supervisors, 231 Md. 561, 191 A.2d 446 (1963), cert. den. 375 U.S. 921, 84 S.Ct. 267, 11 L.Ed.2d 65 (1963), the Court of Appeals of Maryland held that residents of a federal enclave located within the State of Maryland are not residents of the State for the purposes of voting. Plaintiffs claim that as so construed, § 1 of Article I of the Maryland Constitution denies them the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States. For the reasons hereafter stated, we agree.

Under Article I, section 8, clause 17 of the United States Constitution, Congress is empowered to "exercise exclusive Legislation in all Cases whatsoever * * over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of

---

2. In the memorandum opinion accompanying his order, Judge Thomsen said the following:

"The case presents a grave constitutional question, on which there appears to be a paucity of authority. The decision of the question will require careful consideration and will probably affect many persons, because of the number of federal reservations within the State of Maryland. Of necessity, the case was presented to the court with minimal opportunity for preparation by counsel or by the judges. Since the case was heard on complaint, answer and stipulations, a final judgment can be entered at any time, but there will be no adequate opportunity before the election on November 5 for the study and conference which the importance of the case requires."

Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;". Ever since Opinion of the Justices, 42 Mass. 580 (1840), and Sinks v. Reese, 19 Ohio St. 306 (1869), it has been held in most of the cases considering the question that where the federal government has exclusive jurisdiction of an enclave, persons residing in such enclave are not state residents for voting purposes.[3] The rationale for these decisions was stated by the Court in Sinks v. Reese as follows, at page 316:

> "By becoming a resident [of the federal enclave], a person though up to that time he may have been a citizen and resident of Ohio, ceases to be such; he is relieved from any obligation to contribute to their revenues, and is subject to none of the burdens which she imposes upon her citizens. He becomes subject to the exclusive jurisdiction of another power, as foreign to Ohio as is the states of Indiana or Kentucky, or the District of Columbia."

In the earlier cases, there was little doubt that the United States had exclusive jurisdiction over the enclave in question. However, the issue is presented in a somewhat different light in the pending case as a result of the enactment by Congress of various statutes which have effected a retrocession to Maryland and other states of portions of the federal government's exclusive jurisdiction over federal enclaves and the exercise by Maryland of the powers which Congress has returned to the State.

Where the federal government has exclusive jurisdiction over land located within the geographical boundaries of a state, it can hardly be doubted that no constitutional right of a resident of the enclave is infringed by the state's refusal to grant such resident the right to vote. But it would be equally clear that if there were a retrocession by the federal government to a state of all or substantially all incidents of jurisdiction, such state could not constitutionally deny residents of the enclave the right to vote.[4] The facts of the present case lie somewhere in between these readily demonstrable extremes. The question here is whether Maryland has undertaken to impose on residents of this federal enclave obligations and duties of state citizenship to such a degree that it would amount to unconstitutional discrimination if the right to vote were not likewise granted. Determination of this question requires a balancing of the incidents of jurisdiction still retained by the federal government against those exercised by the State of Maryland as well as consideration of the nature of the right that plaintiffs claim has been denied to them.

Exclusive jurisdiction to lands acquired by the United States for general purposes was ceded by the State of Maryland to the federal government by virtue of Chapter 743 of the Acts of 1906, now codified as §§ 31, 36 and 37 of Article 96 of the Annotated Code of Maryland (1964 Repl. Vol.). Specific consent was given for the acquisition of the grounds of the National Institute of Health in Montgomery County by § 34 of Article 96. Both § 34 and § 36 provide

---

3. In the *Royer* case, the Maryland Court of Appeals followed Lowe v. Lowe, 150 Md. 592, 133 A. 729, 46 A.L.R. 983 (1926), which held that a resident of a federal enclave in Cecil County had not acquired a State residence for the purpose of filing a divorce suit. Other state cases reaching the same result as to voting rights are collected in 34 A.L.R.2d 1193–1202 (1954).

4. See Report of the Interdepartmental Committee for the Study of Jurisdiction over Federal Areas within the States, Part II (June 1957), pages 221–222. This Committee was formed in 1954 with the approval of President Eisenhower to study the problems arising out of the jurisdictional status of federally owned areas within the several states, which the Department of Justice had found to be "in a confused and chaotic state." Part I, page 2. The Committee noted that there were four categories of legislative jurisdiction over such areas: exclusive jurisdiction, concurrent jurisdiction, partial jurisdiction and proprietorial interest only. A discussion of these four categories may be found at pages 15–22 of Part I of the Report.

that the State shall retain the right to serve on the federal lands civil and criminal process of the courts of the State.[5]

The first of a series of enactments returning to the states portions of the federal government's exclusive jurisdiction over enclaves was passed by Congress in 1928. In that year, a statute was enacted which provided that in the case of the wrongful death of any person on a federal enclave, the same right of action would exist as though the place were under the jurisdiction of the state within whose exterior boundaries the place was. 16 U.S.C. § 457. In 1936, Congress authorized the states to extend to such areas their workmen's compensation laws. 40 U.S.C. § 290. In that same year, the Lea Act was passed which permitted the levying of gasoline and other motor vehicle fuel taxes upon fuels sold in federal enclaves. 4 U.S.C. § 104.

In 1939, jurisdiction was returned to the states to enforce their unemployment insurance laws within the borders of federal lands. 26 U.S.C. § 3305(d). The most extensive and far reaching retrocession statute enacted by Congress was the Buck Act in 1940. 4 U.S.C. §§ 105–110. That enactment gave the states "full jurisdiction and power" to levy and collect sales, use and income taxes within federal enclaves. A 1947 enactment permitted the states to tax a lessee's interest in real estate leased by the federal government from within an enclave. 10 U.S.C. § 2667(e).

Under the Assimilative Crimes Act, 18 U.S.C. § 13,[6] the criminal laws of the states are applicable to federal enclaves, if the act or omission is not punishable by a Congressional statute. A 1948 amendment of this Act provides that the state law in force at the time of the act or omission governs if there is no pertinent federal law, eliminating the previous requirement of periodic re-enactments of the Act to keep abreast of changes in state penal laws. In 1950, Congress provided for payments by the federal government to local schools for the children of residents of federal reservations attending such schools. 20 U.S.C. § 236 et seq.[7]

The Maryland Legislature, although not granting residents of federal enclaves within the State the right to vote, has conferred other benefits of State citizenship on such individuals. Following the decision of the Court of Appeals in Lowe v. Lowe, supra, the Legislature in 1927 permitted residents of federal enclaves to use the State courts for divorce matters. § 23 of Article 16, Annotated Code of Maryland (1957 Ed.). Later it opened the State courts to such residents for adoption proceedings. § 69, Article 16. Children of such residents are permitted to attend school in the counties in which are located the reservations where they live.

This cataloguing of State and federal enactments indicates that the concept of exclusive federal jurisdiction over reservations such as the one here involved has been drastically altered within the past 40 years. The plaintiffs here may be prosecuted under State criminal statutes, are subject to State unemployment and workmen's compensation laws, and have access to the State courts under acts permitting divorce and adoption proceedings. However, they have no voice in the selection of legislators who may amend these statutes or enact new ones which will affect their rights as to these matters. The children of these plaintiffs attend local schools in Montgomery Coun-

---

5. The reservation of this right has been seen as an act of comity and not inconsistent with the exclusive jurisdiction of the federal government. Fort Leavenworth R.R. Co. v. Lowe, 114 U.S. 525, 534, 5 S.Ct. 995, 29 L.Ed. 264 (1885).

6. The first Assimilative Crimes Act was enacted in 1825 and has been amended on several occasions since then. See Report of the Interdepartmental Committee, Part II, pages 126–131.

7. It should further be noted that plaintiffs are counted as residents of Maryland under the decennial census. Therefore, Maryland's apportionment of seats in the United States House of Representatives is based on a population figure which includes them.

ty. Yet their parents have no voice in the selection of members of the school board. Income, sales and gasoline taxes are undeniably major sources of revenue for the State of Maryland. Although the plaintiffs here are compelled to pay such taxes, they may not participate in the election of the legislators responsible for the enactment of tax statutes within the State.

The rationale of the earlier decisions denying the right to vote to a resident of a federal enclave has been undercut by the various retrocessions by Congress of its otherwise exclusive jurisdiction. No longer is it true, as stated in Sinks v. Reese, supra, 19 Ohio St. at 401, that such a resident "is relieved from any obligation to contribute to [a state's] revenues and is subject to none of the burdens which she imposes upon her citizens." Nor is there validity today to the statements made by the Maryland Court of Appeals in 1926 in Lowe v. Lowe, supra, that such residents "are not residents of the state of Maryland * * * for taxation purposes" and that "the federal government has complete and exclusive jurisdiction and power of legislation" over a federal reservation within the State. 150 Md. at pages 600–601, 133 A. at page 733.

The theory of the extraterritoriality of a federal enclave was impliedly rejected by the Supreme Court in Howard v. Commissioners of Sinking Fund of City of Louisville, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953). In that case, the issue was whether the City of Louisville could lawfully annex a federal enclave on which was located a Naval Ordnance Plant. The trial court had concluded that since the federal government had exclusive jurisdiction over the reservation, it was no longer a part of the State of Kentucky, subject to annexation. The Court of Appeals of Kentucky reversed. Commissioners of Sinking Fund of City of Louisville v. Howard, 248 S.W. 2d 340 (Ky.1952). In affirming that

decision, the United States Supreme Court said the following (344 U.S. at 626–627, 73 S.Ct. at 467):

"A state may conform its municipal structures to its own plan, so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States. Kentucky's consent to this acquisition gave the United States power to exercise exclusive jurisdiction within the area. A change of municipal boundaries did not interfere in the least with the jurisdiction of the United States within the area or with its use or disposition of the property. *The fiction of a state within a state can have no validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government.* The sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is friction, not fiction, to which we must give heed." (Emphasis added)

The State of Maryland here argues that since substantial portions of the federal government's exclusive jurisdiction over this land is still retained by the United States, the State is constitutionally justified in declining to permit plaintiffs to vote. In particular, it is noted that the plaintiffs pay no property taxes,[8] that they are exempt from personal service as a part of the State's unorganized militia, that their children are not subject to State compulsory education laws and that they are exempt from State jury service. That the federal government still retains wide authority over this federal enclave does not answer the question before the Court, for it is likewise clear that in the aggregate the jurisdiction over plaintiffs that has been returned to Maryland is extensive. We are not concerned here with Maryland's refusal to grant to residents

8. Property taxes account for about 50% of the operating budget of the Montgomery County Board of Education and about 12% of the operating budget of the County itself.

of a federal enclave ordinary rights and privileges given to other citizens of the State. The question before the Court is whether the State can constitutionally withhold from these plaintiffs a right as vital as the right to vote.

Exercise of the elective franchise has always been considered one of the most basic of those rights enjoyed by a citizen of a free democratic society. In Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), the Supreme Court had before it a challenge to a provision of the Texas Constitution which prohibited from voting in State elections any member of the armed forces moving to Texas during his tour of duty. In finding that such a prohibition was an invidious discrimination in violation of the Fourteenth Amendment, the Court said the following at page 96, at page 780 of 85 S.Ct.:

> "We deal here with matters close to the core of our constitutional system. 'The right * * * to choose,' United States v. Classic, 313 U.S. 299, 314 [61 S.Ct. 1031, 1037, 85 L.Ed. 1368], that this Court has been so zealous to protect, means, at the least, that States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State. Oyama v. California, 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. 249]."

In the more recent case of Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed. 2d 24 (decided October 15, 1968), the Court reaffirmed its statement in Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), in which it said the following with reference to the right to vote (at page 31, at page 10 of 89 S.Ct.):

> "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most

basic, are illusory if the right to vote is undermined".

We conclude that on balance the plaintiffs here are treated by the State of Maryland as state residents to such an extent that it is a violation of the Fourteenth Amendment for the State to deny them the right to vote. A state may not subject an individual who resides within its geographical boundaries to substantial obligations of citizenship and at the same time deny such individual the correlative right to exercise a voice in defining the nature and extent of such obligations. It is no answer to say that there are many rights and obligations of citizens of Maryland which are not enjoyed by or have not been assumed by these plaintiffs. Without determining which way the scales would tip with respect to other rights, we are of the opinion that the incidents of jurisdiction exercised by Maryland over these plaintiffs are sufficiently weighty that the important right claimed here cannot be constitutionally denied.

Similar reasoning was employed by the Court in Arapajolu v. McMenamin, 113 Cal.App.2d 824, 249 P.2d 318, 34 A.L.R. 2d 1185 (1952),[9] a decision of the California District Court of Appeal, review of which was denied by the Supreme Court of California. In finding that a resident of a federal enclave located within the state of California was a resident of the state entitled to vote, the court said the following (249 P.2d at 323, 34 A.L.R.2d at 1191–1192):

> "The jurisdiction over these lands is no longer full or complete or exclusive. A substantial portion of such jurisdiction now resides in the States and such territory can no longer be said with any support in logic to be foreign to California or outside of California or without the jurisdiction of California or within the exclusive jurisdiction of the United States. It is our conclusion that since the State

9. Two other state courts have likewise held residents of a federal enclave to be residents of the state for voting purposes. Adams v. Londeree, 139 W.Va. 748, 83 S.E.2d 127 (1954) and Rothfels v. Southworth, 11 Utah 2d 169, 356 P.2d 612 (1960).

of California now has jurisdiction over the areas in question in the substantial particulars above noted residence in such areas is residence within the State of California entitling such residents to the right to vote given by sec. 1, Art. II of our Constitution."

For the reasons stated, plaintiffs are entitled to the relief that they are seeking. Counsel should prepare and submit within ten days an appropriate order.