EVANS ET AL. *v.* CORNMAN ET AL.

No. 236. Argued January 22, 1970—Decided June 15, 1970

*Robert F. Sweeney,* Deputy Attorney General of Maryland, argued the cause for appellants. With him on the briefs were *Francis B. Burch,* Attorney General, and *George W. Liebmann* and *Henry R. Lord,* Assistant Attorneys General.

*Richard Schifter* argued the cause for appellees. With him on the brief was *Howard J. Thomas.*

*Solicitor General Griswold, Assistant Attorney General Leonard,* and *Francis X. Beytagh, Jr.,* filed a brief for the United States as *amicus curiae* urging affirmance.

Opinion of the Court by MR. JUSTICE MARSHALL, announced by MR. JUSTICE STEWART.

Appellees live on the grounds of the National Institutes of Health (NIH), a federal reservation or enclave located within the geographical boundaries of Montgomery County in the State of Maryland. In October 1968, the Permanent Board of Registry of Montgomery County announced that persons living on NIH grounds did not meet the residency requirement of Art. 1, § 1, of the Maryland Constitution. Accordingly, such persons were not qualified to vote in Maryland elections, and the names of those previously registered would be

removed from the county's voter rolls. Appellees then instituted the present suit against the members of the Permanent Board, requesting that a three-judge Federal District Court be convened to enjoin as unconstitutional this application of the Maryland voter residency law.

After the District Court issued a temporary restraining order so that appellees who had previously registered could vote in the November 1968 general election,[1] the case was considered on the pleadings and stipulations of fact. The District Court issued the requested permanent injunction, holding that to deny appellees the right to vote was to deny them the equal protection of the laws. *Cornman* v. *Dawson*, 295 F. Supp. 654 (D. C. Md. 1969). Thereafter, a motion by the present appellants to intervene as additional defendants was granted, and a direct appeal was prosecuted to this Court under 28 U. S. C. § 1253. We noted probable jurisdiction, 396 U. S. 812 (1969), and we affirm.

Under Art. I, § 8, cl. 17, of the United States Constitution, Congress is empowered to "exercise exclusive Legislation in all Cases whatsoever . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." NIH, a medical research facility owned and operated by the United States Government, is one of the places subject to that congressional power. The facility commenced operation more than 30 years ago, when land was purchased and residential buildings were built to allow scientists and doctors to live near their work. It did not become a federal reservation, however, until 1953

---

[1] Of the 12 appellees, 10 were registered to vote in Maryland prior to the commencement of this suit. The other two had sought to register but were not allowed to because they lived on NIH grounds.

when the State of Maryland ceded jurisdiction over the property to the United States.[2]

Before that time, persons who resided on NIH grounds could register and vote in Montgomery County; they continued to do so, apparently without question, for another 15 years. In 1963, however, in a case involving residents of another federal enclave, *Royer* v. *Board of Election Supervisors,* 231 Md. 561, 191 A. 2d 446, the Maryland Court of Appeals ruled that a resident of a federal reservation is not "a resident of the State" within the meaning of that term in Art. 1, § 1, of the Maryland Constitution, the provision that governs voter qualifications.

It was the *Royer* decision that prompted the action of the election officials in the present case. Appellants rely heavily on it and urge simply that persons who live on NIH grounds are residents of the enclave, not residents of the State of Maryland. Maryland may, of course, require that "all applicants for the vote actually fulfill the requirements of bona fide residence." *Carrington* v. *Rash,* 380 U. S. 89, 96 (1965). "But if they are in fact residents, with the intention of making [the State] their home indefinitely, they, as all other qualified residents, have a right to an equal opportunity for political representation." *Id.,* at 94.

What was said in *Carrington,* rejecting in another context a different artificial gloss on a residency requirement, is applicable here as well. Appellees clearly live within the geographical boundaries of the State of Maryland, and they are treated as state residents in the census and in determining congressional apportionment. They are not residents of Maryland only if the NIH grounds ceased to be a part of Maryland when the enclave was created. However, that "fiction of a state within a state" was specifically rejected by this Court in *Howard* v. *Commis-*

---

[2] See Md. Ann. Code, Art. 96, § 34.

*sioners of Louisville,* 344 U. S. 624, 627 (1953), and it cannot be resurrected here to deny appellees the right to vote.

Appellants argue that even if appellees are residents of Maryland, the State may constitutionally structure its election laws so as to deny them the right to vote. This Court has, of course, recognized that the States "have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter* v. *Northampton Election Board,* 360 U. S. 45, 50 (1959). At the same time, however, there can be no doubt at this date that "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 665 (1966); see *Williams* v. *Rhodes,* 393 U. S. 23, 29 (1968). Moreover, the right to vote, as the citizen's link to his laws and government, is protective of all fundamental rights and privileges. See *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370 (1886); *Wesberry* v. *Sanders,* 376 U. S. 1, 17 (1964). And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.

The sole interest or purpose asserted by appellants to justify the limitation on the vote in the present case is essentially to insure that only those citizens who are primarily or substantially interested in or affected by electoral decisions have a voice in making them. Without deciding the question, we have assumed that such an interest could be sufficiently compelling to justify limitations on the suffrage, at least with regard to some elections. See *Kramer* v. *Union School District,* 395 U. S. 621, 632 (1969); *Cipriano* v. *City of Houma,* 395 U. S. 701, 704 (1969). However, it is clear that such a claim cannot lightly be accepted. This Court has held that a

State may not dilute a person's vote to give weight to other interests, see, *e. g., Reynolds* v. *Sims,* 377 U. S. 533 (1964), and a lesser rule could hardly be applicable to a complete denial of the vote. See *Kramer* v. *Union School District, supra,* at 626–627. All too often, lack of a "substantial interest" might mean no more than a different interest, and " '[f]encing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Carrington* v. *Rash, supra,* at 94.

According to appellants, NIH residents are substantially less interested in Maryland affairs than other residents of the State because the Constitution vests "exclusive Legislation in all Cases whatsoever" over federal enclaves to Congress. Appellants cite decisions dating back to *Opinion of the Justices,* 42 Mass. 580 (1841), and *Sinks* v. *Reese,* 19 Ohio St. 306 (1870), denying enclave residents the right to vote on the ground that the State has no jurisdiction over them.[3] We need not consider, however, whether these early cases would meet the requirements of the Fourteenth Amendment, for the relationship between federal enclaves and the States in which they are located has changed considerably since they were decided. As the District Court noted, Congress has now permitted the States to extend important aspects of state powers over federal areas. While it is true that

---

[3] In addition to the *Royer* decision of the Maryland Court of Appeals, there are a number of other state court rulings to the same effect. See, *e. g., Herken* v. *Glynn,* 151 Kan. 855, 101 P. 2d 946 (1940); *Arledge* v. *Mabry,* 52 N. M. 303, 197 P. 2d 884 (1948); *McMahon* v. *Polk,* 10 S. D. 296, 73 N. W. 77 (1897); *State ex rel. Lyle* v. *Willett,* 117 Tenn. 334, 97 S. W. 299 (1906).

At the same time, however, there is a contrary line of recent state decisions granting enclave residents the right to vote. See *Arapajolu* v. *McMenamin,* 113 Cal. App. 2d 824, 249 P. 2d 318 (1952); *Rothfels* v. *Southworth,* 11 Utah 2d 169, 356 P. 2d 612 (1960); *Adams* v. *Londeree,* 139 W. Va. 748, 83 S. E. 2d 127 (1954).

federal enclaves are still subject to exclusive federal jurisdiction and Congress could restrict as well as extend the powers of the States within their bounds, see *Offutt Housing Co.* v. *Sarpy County,* 351 U. S. 253 (1956), whether appellees are sufficiently disinterested in electoral decisions that they may be denied the vote depends on their actual interest today, not on what it may be sometime in the future.

Appellants do not deny that there are numerous and vital ways in which NIH residents are affected by electoral decisions. Thus, if elected representatives enact new state criminal laws or sanctions or make changes in those presently in effect, the changes apply equally to persons on NIH grounds. Under the Federal Assimilative Crimes Act, 18 U. S. C. § 13, "acts not punishable by any enactment of Congress are punishable by the then effective laws of the State in which the enclave is situated." *United States* v. *Sharpnack,* 355 U. S. 286, 287 (1958). Further, appellees are as concerned with state spending and taxing decisions as other Maryland residents, for Congress has permitted the States to levy and collect their income, gasoline, sales, and use taxes— the major sources of state revenues—on federal enclaves. See 4 U. S. C. §§ 104–110. State unemployment laws and workmen's compensation laws likewise apply to persons who live and work in federal areas. See 26 U. S. C. § 3305 (d); 40 U. S. C. § 290. Appellees are required to register their automobiles in Maryland and obtain drivers' permits and license plates from the State; they are subject to the process and jurisdiction of state courts; they themselves can resort to those courts in divorce and child adoption proceedings; and they send their children to Maryland public schools.

All of these factors led the District Court to "conclude that on balance the [appellees] are treated by the State of Maryland as state residents to such an extent that it is

a violation of the Fourteenth Amendment for the State to deny them the right to vote." 295 F. Supp., at 659. Appellants resist that conclusion, arguing that NIH residents do not pay the real property taxes that constitute a large part of the revenues for local school budgets.[4] However, Maryland does not purport to exclude from the polls all persons living on tax-exempt property, and it could not constitutionally do so. *Cipriano* v. *City of Houma, supra;* see *Kramer* v. *Union School District, supra.* Of the other differences asserted between Maryland residents who live on federal enclaves and those who do not, most are far more theoretical than real.[5] In any

---

[4] Except for a lessee's interest in property leased from the United States, see 10 U. S. C. § 2667 (e), Congress has not provided that the States may apply their property taxes to federal enclaves. At the same time, all, or virtually all, enclave real property is owned by the United States and is otherwise exempt from state property taxes. To compensate for this exemption, Congress has provided that increased amounts of federal-aid-to-education funds be paid with respect to federal employees living on federal property. See 20 U. S. C. §§ 236–244, 631–645.

[5] Thus, if there were severance or personal property taxes applicable to residents of Montgomery County (which there are not), they could not be collected on the enclave. Similarly, appellees are exempt from service in the State's unorganized militia (which has apparently never been called up) and from compulsory education laws. Appellants state that a myriad of state regulatory and licensing provisions are not enforceable on the enclave, but no instance of a practical effect on appellees is cited. See also *Chicago & Pacific R. Co.* v. *McGlinn,* 114 U. S. 542 (1885); *Stewart & Co.* v. *Sadrakula,* 309 U. S. 94 (1940).

Perhaps the most real of the differences is that crimes committed on NIH grounds where appellees live, while defined by state law, may only be prosecuted in federal court by federal authorities, whereas the same acts would be prosecuted by state authorities in state courts if they occurred off the enclave. If this difference lessens appellees' interest in state law enforcement and policy at all, it certainly does not do so substantially. All Maryland residents, including appellees, undoubtedly have an interest in state laws and how they are enforced throughout the entire State.

case, these differences, along with whatever others may exist, do not come close to establishing that degree of disinterest in electoral decisions that might justify a total exclusion from the franchise.

In their day-to-day affairs, residents of the NIH grounds are just as interested in and connected with electoral decisions as they were prior to 1953 when the area came under federal jurisdiction and as are their neighbors who live off the enclave. In nearly every election, federal, state, and local, for offices from the Presidency to the school board, and on the entire variety of other ballot propositions, appellees have a stake equal to that of other Maryland residents. As the District Court concluded, they are entitled under the Fourteenth Amendment to protect that stake by exercising the equal right to vote.

The judgment is

*Affirmed.*

Mr. Justice Blackmun took no part in the consideration or decision of this case.