Gen. 49]                                                                      49

## JUVENILE CAUSES

### CONSTITUTIONAL LAW – FEDERAL ENCLAVES – WHETHER STATE AUTHORITIES HAVE JURISDICTION OVER JUVENILE OFFENSES ON ABERDEEN PROVING GROUND

December 26, 2018

*The Honorable Joseph I. Cassilly*
*State's Attorney for Harford County*

You have asked for our opinion on whether Maryland authorities have jurisdiction over a juvenile who commits a delinquent act on the Aberdeen Proving Ground (the "Proving Ground"), a U.S. Army facility located in Harford County. The Proving Ground, as we understand it, was acquired by the federal government from Maryland under the Enclave Clause of the U.S. Constitution and remains under the jurisdiction of the federal government. *See* 93 *Opinions of the Attorney General* 12, 17 & n.4 (2008). According to your request, it has been your view that Maryland authorities do not have jurisdiction over juvenile offenses occurring on the Proving Ground, but the military prosecutor for the Proving Ground has asked you to reconsider that position.

We conclude that Maryland authorities likely have jurisdiction over juvenile offenses occurring on the Proving Ground, so long as the federal government does not certify, under 18 U.S.C. § 5032, that federal jurisdiction is instead warranted. However, if the State would prefer absolute clarity on that question, it could ask the U.S. Secretary of the Army to officially retrocede jurisdiction over juvenile offenses on the Proving Ground. *See* 10 U.S.C. § 2683. That retrocession would be effective once accepted by the Governor under § 6-202 of the General Provisions Article and would preclude any argument that State authorities lack jurisdiction.

### I

### Background

Your question requires us to determine the respective jurisdiction of the United States and Maryland over juvenile justice issues on the Proving Ground. Such "[q]uestions concerning the respective rights of the State and federal governments in lands acquired and being used by the United States are extremely

complex." 63 *Opinions of the Attorney General* 332, 332 (1971). Indeed, "[t]he ownership and operation by the Federal Government of areas within the States gives rise to a host of legal problems largely peculiar to such areas." *Report of the Interdepartmental Committee for the Study of Jurisdiction over Federal Areas Within the States* 2 (June 1957) ("1957 Report"). That is because the federal government sometimes "has with respect to such properties a special jurisdiction which excludes, in varying degrees, the jurisdiction of the State over them," but in other instances the federal government's jurisdiction is, "to varying exten[t]s, concurrent with that of the State." *Id*. Although it is not necessary to discuss in detail all the permutations of state authority over federal property, we will provide in this background section a brief summary of the relevant principles and examine how those principles apply to the Proving Ground. Then, as further background, we will trace the development of the Maryland and federal laws governing juvenile justice.

## A.    The Enclave Clause of the U.S. Constitution

Although the federal government may come into possession of territory within the borders of a state in many different ways, the focus of this opinion is on territory, like the Proving Ground, that the federal government acquires under the Enclave Clause in Article I, § 8 of the U.S. Constitution. The Enclave Clause authorizes Congress to:

> exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . .

U.S. Const. Art. I, § 8, cl. 17. The provision applies where a state consents to the purchase of property by the federal government for one of the purposes enumerated therein, but not where the federal government acquires territory through other means or for other

purposes.[1] From the earliest days of the Union, many states, including Maryland, have enacted statutes consenting to federal acquisition of territory within their borders under the Enclave Clause. *See* Roger W. Haines, *Federal Enclave Law* 16 (2011) ("Haines"); *see also* 61 *Opinions of the Attorney General* 441, 442-47 (1976) (discussing the history of Maryland's consent statutes).

For territory acquired under the Enclave Clause, the Constitution grants Congress the power to "exercise *exclusive* Legislation." U.S. Const. Art. I, § 8, cl. 17 (emphasis added). At first, the term "exclusive" was read literally as excluding the possibility of any state jurisdiction. *See, e.g., Ft. Leavenworth*, 114 U.S. at 532-33 ("When the title is acquired [under the Enclave Clause], the federal jurisdiction is exclusive of all state authority."); *see also* Haines at 14-16 (explaining that early U.S. Attorneys General believed that states could reserve no jurisdiction over property under the Enclave Clause other than a right to serve civil or criminal process). Accordingly, when states first enacted statutes consenting to federal acquisition of territory, they tended to consent in broad terms to the federal government's exclusive jurisdiction, reserving only the limited right to serve civil and criminal process within the territory. *See* 1906 Md. Laws, ch. 743 §§ 1, 2 (providing consent for the United States to acquire "by purchase, condemnation or otherwise . . . any land in this State required for sites for . . . arsenals or other public buildings whatever, or for any other purposes of the government" and granting the U.S. "exclusive jurisdiction in and over any land so acquired . . . for all purposes" other than the right to serve civil and criminal process).

---

[1] For example, before many states came into existence, the federal government owned vast lands that were ceded from foreign countries or from the original colonies. *See Ft. Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 539 (1885). The federal government sometimes reserved jurisdiction over that land when the surrounding territory became a state, without obtaining the consent of the state. *See id.* at 527-32. Similarly, the federal government may acquire territory through direct purchase of private property or through the exercise of eminent domain, without the consent of the state or for purposes other than those named in the Enclave Clause. *See, e.g., Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 529-30 (1938). Although a state may still cede all or part of its jurisdiction over such property to the federal government, without the state's cession, the federal government's interest remains that of a mere owner. *See id.* at 527-29. When we refer to "federal enclaves," we mean only those areas acquired by the federal government under the Enclave Clause, not through any of these other means.

This literal interpretation of the federal government's jurisdiction over "exclusive" federal enclaves resulted in the so-called doctrine of "extraterritoriality," *i.e.*, that an enclave was entirely foreign to the state in which it was located. Under that doctrine, there was "a thorough separation of the land and its inhabitants from the state." *Lowe v. Lowe*, 150 Md. 592, 732 (1926), *overruled by Hansford v. District of Columbia*, 329 Md. 112 (1993). It was thus generally held that "states cannot take cognizance of any acts done in the ceded places after the cession" and that "the inhabitants of these places cease to be inhabitants of the state and can no longer exercise any civil or political rights under the laws of the state." *Id.* In more recent years, as explained further below, that extraterritoriality doctrine has been significantly eroded, if not disavowed entirely. *See* Part II.A.3, *infra*. But under the strict extraterritorial view prevalent for much of our Nation's history, state laws simply could not apply on exclusive federal enclaves. *See* 1957 Report at 169.

The doctrine of extraterritoriality thus left the residents of federal enclaves to be governed only by federal law, which often put those residents in a jurisdictional no-man's land. *See Lowe*, 150 Md. at 603 (Bond, J., concurring). In Maryland, for instance, the Court of Appeals held in 1926 that residents of a federal enclave were not State residents and, therefore, could not file for divorce in the State's courts. *Lowe*, 150 Md. at 601; *see also Royer v. Board of Election Supervisors*, 231 Md. 561 (1963) (holding that residents of an exclusive federal enclave were not residents of the State for purposes of State voter qualifications), *overruled by Hansford*, 329 Md. at 133; 1957 Report at 214-48 (explaining how the extraterritoriality doctrine often excluded enclave residents from the right to vote in local elections, the right to obtain a divorce, and the right to receive judicial probate relief). Similarly, a 1920 opinion from this Office concluded that children living on the Proving Ground were not entitled to attend Harford County's public schools. 5 *Opinions of the Attorney General* 129, 130 (1920).

To fill these types of legal voids, courts over the years recognized various ways in which state law may apply within a federal enclave or may be enforced by state authorities. Although we will summarize those doctrines in more detail below, one important way in which state jurisdiction may apply is if a state expressly reserves such jurisdiction at the time it consents to provide territory to the federal government under the Enclave Clause. Even though most states in the early years of the Republic broadly consented to federal jurisdiction over federal enclaves, the

Supreme Court ruled in 1937 that the Enclave Clause "contains no express stipulation that the consent of the state must be without reservations." *James v. Dravo Contracting Co.*, 302 U.S. 134, 148-49 (1937). Therefore, the Court ruled, a state could reserve for itself concurrent jurisdiction along with the federal government over federal enclaves, so long as the reservation of rights did not interfere with federal functions. *Id.*; *see also* 40 U.S.C. § 3112 (providing, after *James*, that the federal government "is not required . . . [to] obtain exclusive jurisdiction . . . over land or an interest in land it acquires," and that federal jurisdiction over such land does not exist unless expressly accepted by the federal government).

After *James*, many states amended their consent statutes to reserve concurrent jurisdiction over territory thereafter acquired by the federal government under the Enclave Clause. *See* 1957 Report at 11. Maryland followed suit, adopting a consent statute in 1943 that explicitly reserved for the State "jurisdiction and authority to the fullest extent permitted by the Constitution of the United States and not inconsistent with the governmental uses, purposes, and functions for which the land was acquired or is used." 61 *Opinions of the Attorney General* at 446 & n.4 (quoting Md. Code Ann., Art. 96 § 47 (1957), now codified, with minor changes, at Md. Code Ann., General Provisions ("GP") § 6-201)).[2] Enclaves acquired by the federal government under that type of consent statute, in which a state has broadly reserved jurisdiction over the territory, are generally referred to as "concurrent" federal enclaves to distinguish them from "exclusive" federal enclaves.[3] *See, e.g.,* 1957 Report at 11-12; Haines at 32-33.[4]

---

[2] Maryland's current consent statute is not retroactive. It "does not affect the jurisdiction and authority of the State over land, or persons, property, and transactions on the land, that the United States . . . acquired on or before May 31, 1943, to the extent that the State ceded jurisdiction under" one of various pre-1943 consent statutes that did not reserve concurrent jurisdiction. *See* GP § 6-201(b).

[3] Enclaves in which a state reserves some, but not all, of its jurisdiction have sometimes been referred to as "partial jurisdiction" enclaves. *See* Haines at 5-6; 1957 Report at 12. But that term can lead to confusion, because states will often have partial jurisdiction over certain matters even on exclusive enclaves. To avoid confusion, we will refer in this opinion only to exclusive and concurrent enclaves.

[4] When the state has not given consent to federal acquisition under the Enclave Clause, a different analysis applies as to whether the federal

## B.     *Aberdeen Proving Ground as an Exclusive Federal Enclave*

The changing nature of state consent statutes over the years has, along with other factors, "created an almost infinite number of jurisdictional situations" on federal enclaves. 1957 Report at 11. For example, a state's authority in a concurrent federal enclave may differ significantly from a state's authority in an exclusive federal enclave.     Therefore, to determine the extent of Maryland's jurisdiction over the Proving Ground, we must first consider the terms of the consent statute in place at the time the territory was acquired by the federal government.

The Proving Ground is a U.S. Army installation for the testing of military equipment that comprises approximately 113 square miles in Harford County, Maryland.     The federal government acquired much of the Proving Ground in 1917, during World War I. *See* 93 *Opinions of the Attorney General* at 17 & n.4. Earlier that year, Congress had authorized the President "to take over for the United States the immediate possession and title of any land selected by him . . . for a proving grounds." *United States v. Holmes*, 414 F. Supp. 831, 839 (D. Md. 1976) (internal quotation marks omitted).     Consistent with that authorization, President Wilson issued a Proclamation that condemned for immediate possession and title by the United States much of the Maryland land that would become the Proving Ground. *Id*.

At the time, Maryland had in place a statute that, pursuant to the Enclave Clause, gave broad consent for the United States to acquire "by purchase, condemnation or otherwise . . . any land in this State required for sites for . . . arsenals or other public buildings whatever, or for any other purposes of the government." 1906 Md. Laws, ch. 743 § 1.     That statute expressly granted to the federal government "exclusive jurisdiction in and over any land so acquired . . . for all purposes except the service upon such sites of all civil and criminal process of the courts of this State." *Id.*, § 2; *see also* 61 *Opinions of the Attorney General* at 442.     Under that statute, therefore, the territory acquired for the Proving Ground in 1917 qualified as an "exclusive" federal enclave. 93 *Opinions of the Attorney General* at 17 n.4.

---

government has "exclusive" jurisdiction over the territory or whether, instead, the state maintains concurrent or partial jurisdiction. *See, e.g.*, *United States v. Unzeuta*, 281 U.S. 138, 142 (1930); 1957 Report at 4. It is beyond the scope of this opinion to discuss those separate analyses.

Although Maryland amended its consent statute in 1943 to reserve concurrent jurisdiction over territory thereafter acquired by the federal government, it is our understanding that the federal government acquired most of the Proving Ground before 1943. *See id.* at 17 & n.4. We will thus focus our analysis on the question of State juvenile jurisdiction over Proving Ground territory acquired prior to 1943, *i.e.*, the territory under exclusive federal jurisdiction.

## C.   *Juvenile Delinquency Laws*

### 1.   *State Juvenile Laws*

Like the laws governing federal enclaves, the laws governing juvenile justice have evolved significantly over the past century. Until the early twentieth century, Maryland and most other states did not distinguish between adults who committed crimes and minors who committed crimes:

> At common law, . . . [c]hildren under the age of seven, it was held, were incapable of criminal intent and therefore could not be prosecuted for offenses. Children above that age were treated as adults. They were given the same legal protections and the same punishments as adults.

*In re Johnson*, 254 Md. 517, 521 (1969) (internal quotations omitted). Beginning around 1900, however, progressive social reform movements highlighted the plight of children in jail and focused on the need to rehabilitate, not punish, youthful offenders. *See id.* at 522. In Maryland, for example, the General Assembly in 1902 authorized Baltimore City to appoint a "Magistrate for Juvenile Causes" to have "exclusive jurisdiction of all cases of trial, or commitment for trial, or of commitment to any reformatory or other institution, of all minors under sixteen years of age." *Id.* at 522-23 (quoting 1902 Md. Laws, ch. 611). Still, these procedural changes did not alter the underlying criminal nature of the proceedings; minors in Maryland continued to be charged with the commission of crimes. Indeed, the statutory definition of "delinquency" at the time depended upon that assumption, defining a "delinquent child" as a person less than eighteen years of age "who has violated any criminal law of this State or any ordinance or regulation of a subdivision of the State." 1941 Md. Laws, ch. 526.

In 1943, the Legislature began to make sweeping changes to the juvenile justice system. That year, the Legislature granted the Baltimore City Circuit Court jurisdiction over all "juvenile causes," and, for purposes of that jurisdiction, defined "delinquent child" as a child who commits an offense "which, if committed by an adult, *would be* a crime not punishable by death or life imprisonment." 1943 Md. Laws, ch. 818 (emphasis added). Two years later, the Legislature granted most county circuit courts that same jurisdiction, and explicitly directed that a delinquent child "shall not be charged with the commission of any crime." 1945 Md. Laws, ch. 797.

Under current Maryland law, a "delinquent child" is an individual under the age of eighteen who has committed a "delinquent act," which, in relevant part, means "an act which would be a crime if committed by an adult." Md. Code Ann., Courts and Judicial Proceedings ("CJP"), § 3-8A-01(l), (m) (2013, 2017 supp.). The circuit courts sitting as juvenile courts generally have exclusive original jurisdiction over a delinquent child with a few exceptions, such as where the child is at least 14 years old and alleged to have committed a crime punishable by life imprisonment, or is at least 16 years old and alleged to have committed certain serious crimes. CJP § 3-8A-03(a), (d).[5]

Until the middle of the last century, then, cases involving juvenile offenders were criminal in nature, even if social attitudes about juvenile crime and punishment were shifting. Thereafter, delinquency cases assumed many characteristics of civil proceedings. Delinquency proceedings today "are special hybrid creatures in the law," bearing civil and criminal aspects, but they appear to be more civil than criminal in nature. *Lopez-Sanchez v. State*, 155 Md. App. 580, 598 (2004). As the Court of Special Appeals has explained,

> [t]he Maryland appellate courts frequently have observed that juvenile delinquency proceedings are civil in nature. The observation often is made by way of contrast, to emphasize that a distinction exists between delinquency proceedings involving juvenile offenders and criminal proceedings involving adults in the criminal justice arena, even

---

[5] In these situations, the child is proceeded against as an adult in criminal court, unless the criminal court transfers the case to the juvenile court. *See* Md. Code Ann., Crim. Proc. § 4-202.

> though the conduct underlying a delinquent act and a crime may be the same. . . . "The *raison d'etre* of the Juvenile Causes Act is that a child does not commit a crime when he commits a delinquent act and therefore is not a criminal. He is not to be punished but afforded supervision and treatment to be made aware of what is right and what is wrong so as to be amenable to the criminal laws."

*Id.* at 598-99 (quoting *In re William A.*, 313 Md. 690, 695 (1988) (other internal citations and quotation marks omitted)).

In Maryland, the Department of Juvenile Services ("DJS") has first-line authority for processing alleged juvenile delinquents. The process begins when a DJS intake officer receives a complaint "from a person or agency having knowledge of facts which may cause a person to be subject to the jurisdiction of the [juvenile] court." CJP § 3-8A-10(b)(1). After investigating the complaint, the intake officer may take a variety of actions, including authorizing the appropriate State's Attorney to file a delinquency petition in State court. CJP § 3-8A-10(c)(3)(i). The intake officer may also authorize the filing of a peace order by the State's Attorney, may propose an informal adjustment of the matter, or may refuse to authorize the filing of a petition or peace order. CJP § 3-8A-10(c)(3)(i), (ii), (iii). If the intake officer refuses to authorize the filing of a delinquency petition or peace order, and if the underlying offense would be a felony if it had been committed by an adult, the officer must forward the complaint to the local State's Attorney who may, in his or her discretion, file a delinquency petition or peace order. CJP § 3-8A-10(c)(4).

## 2. *Federal Juvenile Laws*

Motivated by the same concerns as the states, the federal government began to distinguish between adult and juvenile criminal offenders as part of the Federal Juvenile Delinquency Act of 1938. *See* 52 Stat. 764 (1938). The Act defined "juvenile delinquency" as the violation of a federal law, by a person under 18 years of age, which was not punishable by death or life imprisonment. *Id.* The Act's essential purpose was to keep juveniles separate from adult criminals. *See* U.S. Dep't of Justice's Criminal Resource Manual § 116 ("DOJ Crim. Res. Manual").

In 1974, Congress adopted major amendments to this scheme, with two changes relevant here. *See* Pub. L. No. 93-415, 88 Stat.

1109 (1974). First, the statute no longer defined juvenile offenses as crimes; instead, much like Maryland's law, the statute defined "juvenile delinquency" as a violation of federal law committed by a person under the age of 18 which *would have* been a crime if committed by an adult. *Id.*, § 501 (codified at 18 U.S.C. § 5031). Second, Congress mandated a preference for state jurisdiction over all but the most violent federal juvenile delinquents. *See id.*, § 502 (codified at 18 U.S.C. §§ 5031, 5032); s*ee also* DOJ Crim. Res. Manual § 116. In other words, Congress decided to provide for the state-level handling of federal juvenile delinquents, so long as the relevant state authorities were willing and able to assume jurisdiction. 18 U.S.C. § 5032. Today, the statute, as amended, provides in pertinent part:

> A juvenile alleged to have committed an act of juvenile delinquency, other than a violation of law committed within the special maritime and territorial jurisdiction of the United States for which the maximum authorized term of imprisonment does not exceed six months, shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in [a number of federal drug laws], and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

> If the Attorney General does not so certify, such juvenile shall be surrendered to the appropriate legal authorities of such State.

*Id.*

Thus, the federal government generally *must* turn a juvenile over to state authorities, with only three limited exceptions: where the Attorney General certifies that (1) the relevant state court does not have or refuses to exercise jurisdiction; (2) that the relevant

state does not have adequate services for the juvenile; or (3) that the offense is a felony of violence or specified drug-related offense, and there is substantial federal interest to warrant federal jurisdiction. The certification is a jurisdictional requirement, absent which the federal government does not obtain jurisdiction over a juvenile delinquent. *See United States v. Wellington*, 102 F.3d 499, 503 (11th Cir. 1996).

# II

## Analysis

You ask whether Maryland authorities have jurisdiction over a juvenile who commits an offense on the Proving Ground. In answering that question, we focus on the portions of the Proving Ground acquired before 1943—*i.e.*, the territory under "exclusive" federal jurisdiction.[6] We shall determine, first, whether federal law permits Maryland authorities to exercise jurisdiction over juvenile offenses on the Proving Ground and, second, if so, whether Maryland law grants that jurisdiction to its own authorities. As to the first part of that analysis, we will provide a summary of the doctrines under which states might have jurisdiction on an exclusive enclave and then consider whether Maryland's juvenile delinquency laws fall within any of those doctrines. As to the second part of the analysis, we consider whether Maryland's juvenile delinquency laws themselves can apply to acts committed on exclusive federal enclaves.

### A. *A General Summary of the Doctrines Under Which a State May Have Jurisdiction Within an Exclusive Federal Enclave*

Although the Enclave Clause provides Congress with exclusive jurisdiction over federal enclaves, there are at least four ways in which state laws may apply, or in which a state may maintain some kind of jurisdiction, within an exclusive federal enclave: (1) congressional authorization, (2) the so-called "international law rule," (3) the "friction, not fiction" test from *Howard v. Commissioners of Sinking Fund of City of Louisville*,

---

[6] With respect to offenses committed on those portions of the Proving Ground that were acquired by the federal government after 1943, Maryland unquestionably has juvenile jurisdiction, so long as Maryland does not interfere with federal functions or violate the Supremacy Clause of the U.S. Constitution, because the State expressly reserved concurrent jurisdiction over that territory. *See* Part I.B, *supra*.

344 U.S. 624 (1953), and (4) the retrocession of jurisdiction by the federal government. In this section, we provide a general summary of each doctrine.

### 1. *Congressional Authorization*

Congress has, on a piecemeal basis, authorized a range of state laws to apply on exclusive federal enclaves. To take one example, an aggrieved individual may bring a state-law wrongful death or personal injury lawsuit for acts arising on exclusive federal enclaves. *See* 28 U.S.C. § 5001; *see also, e.g., Louisiana United Bus. Ass'n Cas. Ins. Co. v. J & J Maint., Inc.*, 133 F. Supp. 3d 852, 864 (W.D. La. 2015) (explaining that Louisiana's substantive law governed the plaintiff's claim for wrongful death occurring on an exclusive federal enclave, and observing that "concurrent state and federal jurisdiction is created when federal law allows for the application of state law within a federal enclave"). Other examples include federal statutes authorizing the levy of state fuel taxes, 4 U.S.C. § 104; state sales, use, and income taxes, 4 U.S.C. §§ 105-106; and state unemployment compensation laws, 26 U.S.C. § 3305(d).

In the criminal law context, Congress has similarly adopted state criminal laws for application on exclusive federal enclaves through legislation called the Assimilative Crimes Act. *See* 18 U.S.C. § 13(a) ("Whoever within or upon [a federal enclave] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, by the laws thereof at the time of such act or omission, shall be guilty of a like offense and subject to like punishment."). The Assimilative Crimes Act essentially "borrow[s] state law to fill gaps in the federal criminal law that applies on federal enclaves." *Lewis v. United States*, 523 U.S. 155, 160 (1998).

Technically, unlike in the civil law context, state criminal laws adopted through the Assimilative Crimes Act lose their status as state laws and become federal laws. *See Stokes v. Adair*, 265 F.2d 662, 665 (4th Cir. 1959). Given that, criminal offenses occurring on exclusive federal enclaves are generally subject to prosecution only by the federal, not state, government. *See* 56 *Opinions of the Attorney General* 347, 350 (1971) (explaining that "only federal authorities may prosecute, and only federal courts hear, cases involving crimes committed within federal enclaves," even though the crimes "may be defined by the criminal law of" the state); *see also Evans v. Cornman*, 398 U.S. 419, 425 n.5 (1970)

(recognizing that "[p]erhaps the most real of the differences [between Maryland residents who live on an exclusive federal enclave and those who do not] is that crimes committed on [enclave] grounds . . . while defined by state law, may only be prosecuted in federal court by federal authorities"); DOJ Crim. Res. Manual § 664 (explaining that the United States exercises "plenary criminal jurisdiction" over territory under exclusive federal jurisdiction).[7]

### 2. The International Law Rule

The next way that state law may apply in an exclusive federal enclave is by operation of a judicially created rule often referred to as the "international law rule." To help fill the legal void that existed in exclusive federal enclaves before states began to reserve concurrent jurisdiction, the Supreme Court held that all of a state's civil laws in effect when the federal government acquires an enclave remain in effect, so long as those laws are not abrogated or changed by Congress and are not otherwise inconsistent with federal law. *See Chicago, R.I. & P. Ry. Co. v. McGlinn*, 114 U.S. 542, 546-47 (1885); *see also* 93 *Opinions of the Attorney General* at 28. In doing so, the Court analogized the federal government's acquisition of an exclusive enclave within a state to its acquisition of territory from a foreign sovereign:

> It is a general rule of public law . . . that whenever political jurisdiction and legislative power over any territory are transferred from one nation or sovereign to another, the municipal laws of the country—that is, laws which are intended for the protection of private rights—continue in force until abrogated or changed by the new government or sovereign. . . . As a matter of course, all laws, ordinances, and regulations in conflict with the political character, institutions, and constitution of the new government are at once displaced. . . . But with respect to other laws affecting the possession, use, and transfer of property, and designed to secure

---

[7] Although crimes committed on exclusive federal enclaves generally may only be prosecuted by federal authorities, delinquent acts are not crimes under either Maryland law or federal law. *See* Part I.C, *supra*. Thus, this limitation does not apply to potential State jurisdiction over juvenile offenses on federal enclaves.

> good order and peace in the community, and
> promote its health and prosperity . . . a change
> of government leaves them in force until, by
> direct action of the new government, they are
> altered or repealed.

*McGlinn*, 114 U.S. at 546-47. This rule "filled a vacuum which would otherwise exist in the absence of Federal legislation," and furnished a code of civil law for Federal enclaves. 1957 Report at 158-59; *see also James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100 (1940).

One practical problem with the rule, however, was that it "froze[]" the content of state laws as of the time of acquisition, Haines at 21, preventing the application of new state laws absent authorization by Congress. The Supreme Court partially addressed that problem by holding that the international law rule extends to later-enacted state laws, so long as the "basic state law" out of which the new law evolved was in effect at the time of the enclave's creation. *Paul v. United States*, 371 U.S. 245, 269 (1963). But that rule, often called the *Paul* rule, does not allow for the application of an entirely new statutory regime to an exclusive federal enclave where that regime was not created until after the enclave was acquired by the federal government.

### 3. The Possible Extension of Jurisdiction Under the Doctrine of "Friction, Not Fiction"

A third way in which states might have jurisdiction in an exclusive federal enclave is through something called the "friction, not fiction" doctrine. This doctrine stems from *Howard v. Commissioners of Sinking Fund of City of Louisville*, the Supreme Court decision that began to erode the principle of strict extraterritoriality, under which exclusive enclaves were entirely separate from the states surrounding them.

In *Howard*, the Court held that Louisville had the power, based on authorization from a federal statute, to collect certain taxes from employees on an exclusive federal enclave. 344 U.S. at 629 (citing 4 U.S.C. §§ 105-106). But more importantly, in the course of doing so, the Court also determined that Louisville had not violated the Enclave Clause by including the enclave within its municipal borders. *Id.* at 626-27. The Court explained that, when the federal government acquired the enclave in question, "the property did not cease to be a part of Kentucky" and could thus be annexed by Louisville under Kentucky law. *Id*. The Court explained that "[t]he fiction of a state within a state can have no

validity to prevent the state from exercising its power over the federal area within its boundaries, so long as there is no interference with the jurisdiction asserted by the Federal Government." *Id.* at 627. As the Court put it, "[t]he sovereign rights in this dual relationship are not antagonistic. Accommodation and cooperation are their aim. It is *friction, not fiction*, to which we must give heed." *Id.* (emphasis added).

*Howard* signaled an important shift, because it "seem[ed] to make untenable the premise of extraterritoriality upon which most of the decisions denying civil political rights and privileges [to exclusive federal enclave residents were] squarely based." 1957 Report at 243-44. Indeed, in 1970, the Supreme Court reaffirmed its rejection of strict extraterritoriality, holding that residents of an exclusive federal enclave within Maryland could not be denied the right to vote in State elections. *Evans*, 398 U.S. at 419-20. The Court explained that Maryland could exclude enclave residents from its elections "only if the [enclave] grounds ceased to be a part of Maryland when the enclave was created." *Id.* at 421. But, the Court held, that precise "'fiction of a state within a state' [had been] specifically rejected by this Court in [*Howard*], and it cannot be resurrected here to deny appellees the right to vote." *Id*. at 421-22.

It is not yet clear whether, or to what extent, this doctrine is an independent ground that can justify the extension of state jurisdiction to an exclusive federal enclave. After *Howard* and *Evans*, many state courts have concluded that, under "[t]he modern view" expressed in those Supreme Court decisions, the Enclave Clause no longer prevents the application of a state law to federal enclaves unless the law actually undermines federal sovereignty. *In re Terry Y*, 101 Cal. App. 3d 178, 181-82 (1980) (citing *Board of Chosen Freeholders of Burlington County v. McCorkle*, 98 N.J. Super 451 (1968)); *see also State v. Debbie F.*, 120 N.M. 665, 667-68 (1995) (stating that the "recent trend is to examine the state law to be applied to determine whether it interferes with federal sovereignty"); *Cobb v. Cobb*, 406 Mass. 21, 25 (1989) ("Since the *Howard* case, State courts have recognized that State law may apply in a federal reservation provided that the State does not interfere with the primary jurisdiction of the Federal government."). Indeed, although the Maryland Court of Appeals has not yet expressly adopted that view, it relied heavily on *Howard* and *Evans* in overturning some of its prior decisions that had

upheld the doctrine of extraterritoriality. *See Hansford*, 329 Md. at 133 (quoting *Evans*, 398 U.S. at 424).[8]

However, as best as we can tell, the federal courts have not yet adopted the same expansive view of the "friction, not fiction" doctrine. *See, e.g.*, *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1239 (10th Cir. 2012) (declining to read *Howard* and *Evans* to mean "that all state laws that do not conflict with federal law or policy are applicable on federal enclaves"); *Kasperzyk v. Shetler Security Servs., Inc.*, No. C-13-3383, 2014 WL 31434, *8-11 (N.D. Cal. Jan. 3, 2014) (same); *see also* David E. Engdahl, *State and Federal Power Over Federal Property*, 18 Ariz. L. Rev. 283, 332-36, 376-82 (1976). In fact, in most contexts where state courts have extended state laws to enclave residents, those decisions have partially relied on, or are at least consistent with, the international law rule, because the "same basic scheme," *Paul*, 371 U.S. at 269, was in force at the time the territory was acquired by the federal government. *See, e.g., Craig v. Craig*, 143 Kan. 624, 56 P.2d 464, 468 (1936) (explaining that Kansas's divorce statutes pre-existed the state's cession of the enclave at issue); *Kasperzyk*, 2014 WL 31434 at *10-11 (noting that *Evans* and similar cases can "easily be reconciled with" the international law rule).

Still, under *Howard* and *Evans*, many states have approved the extension of state laws to exclusive federal enclaves without examining whether the state's statutory scheme pre-existed the acquisition. That has been particularly true when deciding whether to extend state benefits and services to enclave residents. *See, e.g., In re Terry Y*, 101 Cal. App. 3d at 181-82 (upholding state court jurisdiction to protect an abused child residing on an exclusive enclave, because "in the area of the rights of federal enclave residents to state benefits, there has been a trend in state courts to hold that the exclusive jurisdiction of Congress does not deprive enclave residents of benefits which would otherwise be theirs"); *Debbie F.*, 120 N.M. at 667-68 (ruling that state protections for abused and neglected children on an exclusive enclave do not

---

[8] The Court in *Hansford* ruled that Maryland courts had jurisdiction over a wrongful death action arising from allegedly negligent acts that occurred on an exclusive federal enclave within the State and that, pursuant to Congress's authorization in what is now 28 U.S.C. § 5001, the State's substantive law would apply to that action. 329 Md. at 131. Although the Court relied upon *Howard* and *Evans* in rejecting the doctrine of strict extraterritoriality, it did not have occasion to directly consider whether those cases would permit the application of Maryland's substantive law in the absence of congressional authorization.

interfere with federal jurisdiction); Kan. Att'y Gen. Op. No. 81-14 (1981) (same). We need not resolve here the extent to which *Howard* and *Evans* function as an independent ground on which state laws can apply in an exclusive federal enclave. It is enough for our purposes to say that the "friction, not fiction" doctrine means, at the very least, that a state is no longer precluded from extending important protections to individuals within its borders solely because those individuals reside on an exclusive federal enclave.

### 4.  Federal Retrocession or Relinquishment of Jurisdiction

State jurisdiction also may extend to exclusive federal enclaves pursuant to federal statutes that allow certain federal officials to retrocede to a state all or part of the federal government's exclusive jurisdiction over territory under the official's control. *See* Haines at 53-54. For example, in 1970, Congress authorized the Secretaries of the Army, Navy, and Air Force, respectively, to "relinquish to a State . . . all or part of the legislative jurisdiction of the United States over lands or interests under [the Secretary's] control in the State" by filing a "notice of relinquishment" with the "Governor" of the State. 10 U.S.C. § 2683(a). Generally, under such statutes, the federal government decides to relinquish only its *exclusive* jurisdiction, thereby allowing the state to exercise concurrent jurisdiction over the enclave while permitting the United States to continue to exercise its own jurisdiction. *See* Haines at 53-54.

A relinquishment under § 2683 takes effect upon acceptance of the relevant state's governor or as otherwise provided for in the state's laws. *See* 10 U.S.C. § 2683(a). In Maryland, the Governor may accept the federal government's relinquishment under GP § 6-202, which provides that "the Governor may enter into an agreement with the United States to establish full or partial concurrent jurisdiction of the State and the United States over any land in the State held by the United States."[9]  This mechanism effectively permits a state to exercise concurrent jurisdiction over certain matters (or, if the federal government so chooses, all matters) in all or part of a territory that would otherwise have been an exclusive federal enclave.

---

[9] It is our understanding that, traditionally, these agreements have then been submitted to the Board of Public Works ("BPW") for its approval. It is not clear to us whether State law in fact requires these agreements to be approved by the BPW, but there is no need for us to decide that question here.

### B.    The Doctrines Applied: Does Federal Law Permit Maryland Authorities to Exercise Jurisdiction over Juvenile Offenses on the Proving Ground?

We next consider whether any of the doctrines discussed in the previous section permit Maryland to exercise jurisdiction over juvenile offenses that occur on the areas of the Proving Ground over which the federal government has "exclusive" jurisdiction. We first examine whether Congress has authorized the states to assert jurisdiction over matters of juvenile delinquency in exclusive enclaves.    Although Congress has not expressly granted jurisdiction over juvenile delinquents to the states in precisely those terms, we conclude that Congress has, by clear implication, authorized the states to exercise such jurisdiction on exclusive federal enclaves through 18 U.S.C. § 5032 of the Federal Juvenile Delinquency Act.

Section 5032 provides that federal authorities "shall" turn a juvenile over to state authorities unless the U.S. Attorney General certifies that: (1) the relevant state court does not have, or refuses to exercise, jurisdiction; (2) the relevant state does not have adequate services for the juvenile; or (3) the offense is a felony of violence or specified drug-related offense, and there is substantial federal interest in the case to warrant federal jurisdiction.    18 U.S.C. § 5032.    If the Attorney General does not so certify, therefore, the statute effectively mandates that the federal government defer to state authorities to handle juvenile offenses.

Although the statute does not explicitly say that § 5032's requirement to defer to state jurisdiction applies to juvenile offenses committed on exclusive federal enclaves, that appears to be the intent. *See* Haines at 90.  Indeed, Congress confirmed that intent in 1984 when it amended the law to exempt from the certification process (and thus to allow the United States to maintain jurisdiction over a juvenile without going through that process) a small category of juvenile offenses "committed within the special maritime and territorial jurisdiction of the United States," Pub. L. No. 98-473, 98 Stat. 2149 (1984)—a term that explicitly includes exclusive federal enclaves. *See* 18 U.S.C. § 7(3) (defining "special maritime and territorial jurisdiction" to include, among other things, "[a]ny lands reserved or acquired for the use

of the United States, and under the exclusive or concurrent jurisdiction thereof").[10]

That decision to exempt only some offenses in the federal government's "special maritime and territorial jurisdiction" from the certification procedure suggests that federal authorities must refer all other juvenile offenses committed within that special jurisdiction—including those on exclusive enclaves—to the states, unless the U.S. Attorney General certifies otherwise. After all, if Congress did not intend for state juvenile jurisdiction to extend to exclusive federal enclaves, there presumably would have been no need to distinguish between offenses in exclusive enclaves that require certification in order to assert federal jurisdiction and those that do not, because the federal government's jurisdiction would be exclusive regardless of the offense. In other words, given that § 5032 contemplates deference to state authorities over juvenile offenses on exclusive enclaves except in very limited circumstances, the statute implies that Congress intended for state jurisdiction to extend to juvenile offenses on such enclaves.

We recognize an argument could be made that Congress meant only to defer to state jurisdiction in *concurrent* enclaves, where states reserved their jurisdiction, rather than to affirmatively authorize states to exercise jurisdiction over juvenile offenses in exclusive enclaves. *See* 18 U.S.C. § 5032 (providing that the Attorney General can decline to turn a juvenile over to state authorities where the state lacks jurisdiction); *see also* George R. Lavine III, *Protect Our Military Children: Congress Must Rectify Jurisdiction on Military Installations to Address Juvenile-on-Juvenile Sexual Assault*, 18 Wyo. L. Rev. 115, 120-21 (2018) (arguing that § 5032 does not authorize state jurisdiction in exclusive enclaves). But we think it unlikely Congress would have referenced a statutory category—"special maritime and territorial jurisdiction of the United States"—that expressly includes exclusive federal enclaves if it did not intend the provision to apply

---

[10] More specifically, the statute exempts from the certification requirement offenses "committed within the special maritime and territorial jurisdiction of the United States for which the maximum authorized term of imprisonment does not exceed six months." 18 U.S.C. § 5032. That allows the federal government to maintain jurisdiction over petty offenses without going through the cumbersome certification process. But the legislative history of the exception makes clear that, even under those circumstances, "diversion to State authorities is still preferred where possible." Senate Report No. 97-307 at 1178-79 (Dec. 22, 1981).

to exclusive enclaves. The better reading, in our view, is that § 5032 imposes a general rule, subject only to express exceptions, that the states have authority over juvenile offenses committed within federal enclaves.

In fact, our interpretation that state jurisdiction extends to juvenile offenses on exclusive federal enclaves comports with that of the U.S. Department of Justice. The Department, in its Criminal Resource Manual for United States Attorneys, clarifies that "[a] release to state authorities of juveniles who are alleged to have committed an act of juvenile delinquency on a United States military base or other federal enclave is not precluded by the fact of the enclave's 'exclusive jurisdiction' status." DOJ Crim. Res. Manual § 41. The Manual goes on to explain that:

> When a juvenile is charged with committing a violation of federal law *on an exclusive jurisdiction enclave*, the United States Attorney should determine whether the state is willing to assume jurisdiction over the juvenile and has adequate juvenile programs available. Such a determination may be made on a case-by-case basis after consultation with the local prosecutor, or it may be based on a general understanding reached with the local prosecutor regarding the state's willingness to assume jurisdiction over juveniles who commit offenses on federal enclaves.

*Id.* (emphasis added). Thus, in our opinion, § 5032 authorizes state authorities to handle juvenile offenses that occur on exclusive federal enclaves.

That interpretation is also consistent with the decisions of most of the courts that have considered the issue. Although Maryland courts have not yet weighed in, courts in other states have concluded that § 5032 authorizes state jurisdiction over juvenile offenses on exclusive enclaves. For instance, in *State in Interest of D.B.S.*, 137 N.J. Super. 371 (1975), a juvenile challenged the New Jersey juvenile court's jurisdiction over him. The New Jersey courts adjudicated the juvenile as delinquent based on his acts of breaking-and-entering and larceny within the exclusive federal military enclave of Fort Dix, and held that § 5032 "establishes that Congress intended to subject a juvenile to the jurisdiction of a state court" whenever possible. *Id.* at 373, 374-75. Similarly, a New York court held that it had jurisdiction over a juvenile's delinquent acts committed on the exclusive federal enclave of West Point,

because Congress had "expressed an intent" in § 5032 to "specifically defer[] to the states in cases of juvenile offenders." *In re Charles B.*, 196 Misc. 2d 374, 377 (N.Y. Fam. Ct. 2003); *see also M.R.S. v. State*, 745 So. 2d 1139, 1140-41 (Fla. Dist. Ct. App. 1999) (holding that a Florida court had jurisdiction under § 5032 over a juvenile's acts of delinquency on exclusive federal enclave of Eglin Air Force Base). Based in part on these opinions, the Georgia Office of the Attorney General, addressing a question similar to yours, also concluded that § 5032 provides authority for Georgia courts to assume jurisdiction over juvenile offenses occurring on exclusive federal enclaves. *See* 2012 Ga. Unofficial Op. Att'y Gen. No. 2012-2, 2012 WL 6128487 (June 14, 2012).[11]

---

[11] Although we have found some cases concluding that state authorities lacked jurisdiction over juvenile offenses on exclusive enclaves, we think those cases are either distinguishable or do not directly address the issue in question, *i.e.*, whether § 5032 allows a state to exercise jurisdiction in the absence of a federal certification. In *United States v. Juvenile Male*, 939 F.2d 321 (6th Cir. 1991), for example, the Sixth Circuit found that Kentucky's cession of exclusive jurisdiction over Fort Knox was a complete bar to the State's juvenile jurisdiction. In its ruling, the court relied on old authority, citing the extraterritoriality doctrine for the proposition that "persons on the Fort Knox Military Reservation are not within the jurisdiction of the Kentucky courts" and that "Kentucky cannot exercise any jurisdiction over Fort Knox and its residents." 939 F.2d at 323 (alteration omitted). However, because the decision rested upon the extraterritoriality doctrine, which the Supreme Court explicitly rejected in *Evans* and *Howard*, and did not carefully parse § 5032, the decision's precedential value is limited at best. Moreover, the court in *Juvenile Male* was faced with a situation in which the federal government had asserted jurisdiction. Under those circumstances, as the Georgia Office of the Attorney General has pointed out, courts "generally have upheld the jurisdictional authority asserted" because they are loathe to second-guess the federal government's certification under § 5032. Ga. Op. Att'y Gen, 2012 WL 6128487 at *5-6; *see also United States v. JDT*, 762 F.3d 984, 994-95 (9th Cir. 2014) (declining to look behind the certification that the State did not have jurisdiction over a juvenile who committed a delinquent act on a federal enclave). It is not clear that those courts would have reached the same conclusion about state jurisdiction if the federal government had not itself asserted jurisdiction over the juvenile.

Similarly, although the North Carolina Supreme Court held in one case that the State courts did not have jurisdiction over a defendant being tried as an adult for murders he allegedly committed as a juvenile on an exclusive federal enclave, *see State v. Smith*, 328 N.C. 161, 169 (1991), that decision does not conflict with our conclusion here. There, the

Moreover, allowing states to exercise juvenile jurisdiction over exclusive federal enclaves furthers the clear purpose of § 5032. As one federal court has explained, "[t]he certification procedure in the Federal Juvenile Delinquency Act encompasses a recognition of the general policy of federal abstention"—a policy that is necessary because "[t]he federal courts and federal correctional system have never been properly equipped to handle large numbers of juveniles with the result that federal juvenile delinquents are frequently transferred away from their home communities for treatment." *United States v. Sechrist*, 640 F.2d 81, 84 (7th Cir. 1981) (quoting 120 Cong. Rec. 25162 (1974)); *see also* DOJ Crim. Res. Manual § 116 ("The intent of federal laws concerning juveniles is to help ensure that state and local authorities would deal with juvenile offenders whenever possible, keeping juveniles away from the less appropriate federal channels . . . ."). Thus, we conclude that § 5032 authorizes states to exercise juvenile jurisdiction over offenses that occur on exclusive federal enclaves, so long as the assertion of state jurisdiction does not interfere with federal functions, and the U.S. Attorney General does not certify that federal jurisdiction is instead warranted.[12]

We note that our conclusion is also consistent with the trend recognized by many state courts allowing for the broad application of state benefits, services, and protections to residents of federal

---

federal government had certified under § 5032 that the State courts did not have jurisdiction over the defendant. *See id.* at 167. The court felt bound under federal law to accept that determination as final, so did not decide whether § 5032 would otherwise have allowed the State to assume jurisdiction. *Id.* at 167-68 (citing *United States v. Vancier*, 515 F.2d 1378 (2d Cir. 1975)). Moreover, the State authorities in that case were attempting to prosecute the defendant as an adult in a criminal proceeding, rather than in a juvenile proceeding. *Id.* at 165-69. Because the federal government generally has exclusive criminal jurisdiction in exclusive federal enclaves, the North Carolina courts had to defer to the federal government for that reason too. *Id.*

[12] One area in which the assertion of State jurisdiction over a juvenile offender might interfere with federal functions is when the juvenile is a member of the military. In fact, the Federal Juvenile Delinquency Act (and thus § 5032) "is inapplicable to courts-martial or to any juveniles who are members of the military and who are charged with acts of delinquency or with crimes." *See* Ga. Op. Att'y Gen. 2012 WL 6128487 at *3 n.2 (citing *United States v. Thieman*, 34 C.M.R. 106 (1963); *United States v. Baker*, 34 C.M.R. 91 (1963); *United States v. West*, 7 M.J. 570 (1979)). Thus, it may be that State authorities would lack jurisdiction to handle a juvenile offender who is a member of the military.

enclaves "provided that the State does not interfere with the primary jurisdiction of the Federal government." *Cobb*, 406 Mass. at 25; *see also, e.g.*, *Debbie F.*, 120 N.M. at 667-68; *In re Terry Y*, 101 Cal. App. 3d at 181-82. After all, Maryland's juvenile delinquency laws are no longer criminal in nature, but instead resemble in many ways the other kinds of state services and protections that courts have concluded are unlikely to interfere with federal sovereignty. *See, e.g., In re Victor B.*, 336 Md. 85, 90-91 (1994) (explaining that state juvenile courts operate "[u]nder an extension of the doctrine of *parens patriae*, [viewing] juvenile offenders to be in need of protection and rehabilitation rather than punishment.").

As in those other contexts, the federal government has not routinely offered services or facilities for handling the needs of juvenile offenders. *See, e.g., Sechrist*, 640 F.2d at 84. And in the absence of such federal action, there is an argument that states should be able to fulfill their obligations, as *parens patriae*, "to protect and rehabilitate a juvenile . . . who, although housed on land ceded to the Federal Government, is a member of the social community of" that state. *State in Interest of D.B.S.*, 137 N.J. Super. at 375. Thus, although we need not rest our conclusion on the "friction, not fiction" doctrine, Maryland's assertion of jurisdiction over juvenile offenses on the Proving Ground seems entirely consistent with that doctrine.[13]

In sum, federal law likely permits Maryland authorities to exercise jurisdiction over juvenile offenses on the Proving Ground. However, if State authorities would prefer absolute certainty on that point, Maryland could ask the Secretary of the Army to expressly "relinquish" jurisdiction over juvenile offenses on the Proving Ground. *See* 10 U.S.C. § 2683(a); *see also* Lavine, *supra*, at 129-31 (arguing that the Department of Defense should utilize its retrocession power to ensure that states can assert jurisdiction

---

[13] Because Congress enacted § 5032, we need not decide whether the international law rule could have been invoked to justify the application of Maryland's juvenile justice scheme to the areas of the Proving Ground under exclusive federal jurisdiction. We note, however, that the analysis would likely turn on whether today's juvenile justice laws could be considered part of the "same basic scheme," *Paul*, 371 U.S. at 269, as those in existence before 1943, even though the State's juvenile justice laws then were criminal in nature.

over juvenile offenses on federal enclaves).[14]  Once accepted by the Governor under GP § 6-202, that retrocession would unquestionably allow State authorities to handle juvenile offenses on the Proving Ground.  To be clear, we are not saying that retrocession is *required* for State authorities to exercise jurisdiction over juvenile offenses on the Proving Ground.  But the State should give that approach serious consideration, because it could clarify the extent of the State's jurisdiction and, thus, could preclude any possibility that a juvenile delinquent might contest the State's jurisdiction.

## C.  Does Maryland Law Itself Permit State Authorities to Handle Juvenile Offenses on Exclusive Federal Enclaves?

Although we conclude that § 5032 authorizes states to exercise juvenile jurisdiction over offenses on exclusive federal enclaves, that statute also requires us to consider the State of Maryland's ability and willingness to assert that jurisdiction.  *See* 18 U.S.C. § 5032 (permitting federal jurisdiction if the relevant state court does not have or refuses to exercise jurisdiction).  Thus, as the final piece of our analysis, we address whether Maryland's juvenile justice scheme itself can encompass offenses that occur on exclusive federal enclaves like the Proving Ground.  In our view, Maryland law permits State authorities and the State courts to assume jurisdiction over juveniles who commit offenses in exclusive federal enclaves.

As an initial matter, from a procedural perspective, the State's statutes governing the processing of juvenile offenders can accommodate—and, as we understand it, have in the past accommodated—such offenders.  That process begins when an intake officer with DJS receives a complaint "from a person or agency having knowledge of facts which may cause a person to be

---

[14] In fact, at least two small portions of the Proving Ground have been the subject of retrocession agreements in the past.  In 1991, the State accepted concurrent jurisdiction over approximately 128 acres of the Proving Ground near Atkinson Dam, apparently so local law enforcement officials could patrol the area.  *See* Board of Public Works Meeting Agenda and Minutes, Oct. 16, 1991.  Similarly, in 1977, the State accepted concurrent jurisdiction over less than an acre of the Proving Ground so the State could widen the entrance to the Chapel Hill Water Treatment Plant.  *See* Board of Public Works Meeting Agenda, Apr. 6, 1977.  In those two areas, State authorities may unquestionably handle juvenile offenses.

subject to the jurisdiction of the [juvenile] court." CJP § 3-8A-10(b)(1). Given that the statute does not define "person" or "agency" so as to exclude federal personnel or federal agencies, the federal government could presumably file a complaint with DJS about a juvenile who has committed an offense on an exclusive federal enclave within the State. Indeed, the U.S. Military Police Corps has apparently filed complaints with DJS in at least a few instances involving juveniles on federal enclaves, and the juvenile offenders in those cases were turned over to State authorities.[15]

Moreover, if a State's Attorney files a delinquency petition in such a circumstance, the State courts likely have jurisdiction under State law to hear that petition. The circuit courts, sitting as juvenile courts, have jurisdiction over any juvenile who has committed a "delinquent act," *see* CJP §§ 3-8A-01(m) and 3-8A-03(a)(1), which is defined broadly as "an act which would be a crime if committed by an adult," CJP § 3-8A-01(l). That broad definition does not purport to exclude acts by juveniles on property under federal jurisdiction. Therefore, as long as the juvenile's act would constitute a crime if it had been committed by an adult, the statute appears to give the juvenile court jurisdiction over the proceeding, regardless of whether the act occurred on an exclusive federal enclave. Although the Court of Special Appeals has held that juvenile courts do not have territorial jurisdiction over delinquent acts that occur outside of Maryland, *see In re Antonette H.*, 200 Md. App. 341, 344 n.1, 353-54 (2011), the Supreme Court's decisions in *Howard* and *Evans* make clear that the Proving

---

[15] According to DJS, the federal enclaves involved in these instances were Andrews Air Force Base, Patuxent Naval Air Station, and the Naval Ordnance Station at Indian Head. Although these cases came to the State's attention through such referrals, it is not clear that § 5032 would require federal authorities to affirmatively refer the matter to the State before the State may assert jurisdiction. But, in any event, we think it would be prudent for State authorities to cooperate closely with federal authorities on these matters to ensure that the State is not interfering with federal jurisdiction or federal functions. Indeed, the U.S. Department of Justice recognizes that such consultation is important, suggesting that its prosecutor either consult on a "case-by-case basis . . . with the local prosecutor" or enter into a "general understanding . . . with the local prosecutor regarding the state's willingness to assume jurisdiction over juveniles who commit offenses on federal enclaves." DOJ Crim. Res. Manual § 41. Of course, if the State and the Secretary of the Army decide to enter into a retrocession agreement, that would also clarify any remaining ambiguities about the governments' respective roles.

Ground is part of Maryland, even though much of it is under exclusive federal jurisdiction.[16] *See* Part II.A.3, *supra*. Thus, Maryland's juvenile justice scheme—from DJS's intake process through the filing of a delinquency petition by a State's Attorney— is likely broad enough to permit State authorities to exercise jurisdiction over a juvenile who commits a delinquent act on an exclusive federal enclave such as the Proving Ground.[17]

## III

## Conclusion

In sum, we conclude that Maryland State authorities likely have jurisdiction over a juvenile who commits an act of delinquency within the Aberdeen Proving Ground, subject to the federal government's ability to assert its jurisdiction through the limited certification procedures in 18 U.S.C. § 5032. However, Maryland authorities may wish to consider seeking from the Secretary of the Army an official retrocession of jurisdiction over juvenile offenses so as to preclude any argument to the contrary and to clarify the respective roles of the State and federal government as to juvenile delinquents on the enclave.

Brian E. Frosh
Attorney General of Maryland

Jeffrey P. Hochstetler
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice

---

[16] For purposes of personal jurisdiction, venue, and service of process, too, state court jurisdiction extends to "any federal enclave, reservation, or land within the geographical limits" of the State. *See* CJP § 6-101(a)(2), (4); *see also Hansford*, 329 Md. at 127-28.

[17] We do not mean to suggest, however, that State or local police may patrol the areas of the Proving Ground within the federal government's exclusive jurisdiction so as to arrest juveniles who commit delinquent acts there. For those areas, the police would likely require the retrocession of jurisdiction by the Secretary of the Army before they may exercise their law enforcement powers. *See* 56 *Opinions of the Attorney General* at 349-50 (explaining that exclusive federal jurisdiction in an enclave generally acts to "deny to the State any [criminal] law enforcement power whatsoever within the boundaries" of that enclave, unless Congress has "returned any of its exclusive criminal jurisdiction" in the enclave to the State).

*Editor's Note:*

After issuance of this opinion, our Office clarified in later letters of advice that the historic practice of submitting to the Board of Public Works at least certain kinds of requests from the federal government to retrocede concurrent jurisdiction to Maryland over exclusive federal enclaves was based in part on the prior opinion of our Office in 63 *Opinions of the Attorney General* 332 (1978). *See* Letter from Patrick B. Hughes, Chief Counsel, Opinions & Advice, to Gavin Patashnick, Deputy State's Attorney for Harford County (Mar. 12, 2020); Letter from Jeremy McCoy, Assistant Attorney General, to Del. Geraldine Valentino-Smith (Feb. 3, 2022). As those later advice letters make clear, this opinion did not decide the circumstances, if any, under which the Board of Public Works might need to approve retrocession of jurisdiction by the United States or under which the procedures outlined in 63 *Opinions of the Attorney General* 332 might still apply after the enactment of § 6-202 of the General Provisions Article.